**Bernard A. MITCHELL and Marjorie Mitchell**

v.

**The UNITED STATES.**

No. 255–64.

United States Court of Claims.
March 14, 1969.

Nichols and Davis, JJ., dissented.

Arthur S. Freeman, Chicago, Ill., attorney of record, for plaintiffs. Julian L. Berman, Chicago, Ill., of counsel.

Joseph A. Kovner, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Philip R. Miller and Richard J. Boyle, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on May 9, 1968. Exceptions to the commissioner's opinion, findings of fact and recommended conclusion of law were filed by defendant and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Therefore, plaintiffs are entitled to recover and judgment is entered for plaintiffs with the amount of recovery to be determined pursuant to Rule 47(c).

## OPINION OF COMMISSIONER

### FLETCHER, Commissioner:

In this income tax case the court is required to determine the proper treatment to be accorded legal and accounting expenses which were incurred by plaintiffs in the defense of a lawsuit where it was alleged that the taxpayer, Bernard A. Mitchell,[1] committed fraud in the sale of certain corporate stock. Mitchell contends that he is entitled to deduct those expenses under either Section 162(a) or Section 212 of the Internal Revenue Code of 1954. The Government responds that the expenses were capital expenditures incurred by Mitchell as a result of the disposition by him of capital assets and, hence, they must be treated as capital losses.

In the view I take of this case, the taxpayer is entitled to deduct the legal and accounting expenses in question under Section 162(a), and, hence, it is unnecessary to reach his alternate conten-

---

* The dissenting opinion of NICHOLS, Judge, in which DAVIS, Judge, joins, follows the opinion of the Trial Commissioner which has been adopted by the court.

1. Plaintiff wife, Marjorie Mitchell, is a party hereto solely by reason of her having filed joint tax returns with her husband for the years at issue. Accordingly, in this opinion, Bernard A. Mitchell is referred to either by his last name or as the "taxpayer."

tion that, in all events, he is entitled to deduct them under Section 212. Section 162(a) provides, in pertinent part, as follows:

IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

It can be seen at a glance that in order to qualify for a deduction under this section, the expenses must be ordinary and necessary; they must be paid or incurred during the taxable year; and they must have been paid or incurred in the carrying on of a trade or business.

■ There is no dispute that the legal and accounting expenses involved were paid by Mitchell during the years in question. Also, under such decisions of the United States Supreme Court as Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171 (1943) and Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966), there should be little question that such expenses were ordinary and necessary. The remaining question, therefore, is whether in the years involved Mitchell was engaged in a trade or business, and if he were so engaged, did the legal and accounting expenses paid by him arise out of the carrying on of such trade or business? The resolution of this remaining question requires a brief summary of Mitchell's business activities and an analysis of the nature of the lawsuit which he was called upon to defend.

The essential facts are these. Many years ago, Mitchell founded the Mitchell Manufacturing Company (MMC). Originally, MMC was a manufacturer of table lamps but over the years the business was developed further into the manufacturing of fluorescent lighting fixtures, self-contained air conditioning units, and other products. Mitchell has always been the president and chief executive officer, as well as the major stockholder, of MMC from the time of its incorporation. He did not confine his business activities, however, to directing the affairs of MMC. He also became an officer and director in several other unrelated corporations from which he received substantial compensation. For example, during the period 1947–1954, he received salaries from four companies (including MMC), totaling about $68,000 per year.

The Cory Corporation was a competitor of MMC in the manufacture of air conditioning units. Sometime in 1955, representatives of Cory contacted Mitchell and advised him that Cory was interested in acquiring MMC at a price of approximately $2 million. Mitchell was impressed by this offer, and negotiations ensued between him and Cory's representatives.

From the MMC side of the table, these negotiations were conducted by Mitchell almost exclusively in behalf of himself and the other MMC stockholders who were members of his family. As MMC's chief executive officer, the Cory representatives looked to Mitchell for the furnishing of information desired by them with respect to MMC's operations and financial condition. During the course of the negotiations it became apparent that there was a question of possible contingent liabilities facing MMC for Federal excise and income taxes, as well as for product warranties. Mitchell recognized the possible existence of such liabilities, and he approximated them at $500,000. He therefore agreed to reduce the purchase price of the MMC stock by that amount.

On November 7, 1955, Mitchell and his fellow stockholders entered into a final agreement whereby they sold all their stock to Cory for $1,564,209.24. For his 22,590 shares, Mitchell received $658,-783.38 which he reported in his 1955 Federal income tax return as a long-term capital gain after deducting his basis and selling expenses therefrom. His treatment of this transaction on his tax return is not in dispute.

Thereafter, Mitchell continued to conduct his business activities as a corporate official, and he was connected with

numerous corporations. He became associated in 1956 with a group of New York financiers, and together they started acquiring interests in various industrial corporations. One of these ventures was the acquisition by them in 1956 of a corporation in Atlanta, Georgia, presently known as Fulton Industries, Inc. At the time of the purchase negotiations, the attorney for the sellers made a complete investigation of Mitchell and his associates.

The attorney concluded that Mitchell was a hard working corporate executive, that his reputation for honesty and integrity in his business and personal dealings was the very best, and that he was a very capable businessman. Consequently, the purchase agreement was concluded and control of Fulton Industries passed to the Mitchell group. After having initially held other positions with Fulton, Mitchell is today its president, a member of its board of directors, and chairman of its executive committee. During this period of 1956–1958, Mitchell was also active in various other business corporations and real estate projects, both as a manager and investor. Since that time, he has continued to be well-known in the business world, both as a corporate executive and as a developer of various real estate projects.

In December 1958, Cory filed a suit in the Superior Court of Cook County, Illinois, against Mitchell and the other former shareholders of MMC. The complaint alleged that all of the defendants, and particularly Mitchell, had fraudulently misrepresented the facts relating to MMC's liabilities for Federal income and excise taxes and for product warranties. It alleged, *inter alia*, that because of Mitchell's fraud, deceit, misrepresentations, and concealments during the 1955 negotiations, The Cory Corporation had suffered damages in the total amount of at least $3,706,801.92. It concluded, however, that because Mitchell, in breach of his fiduciary relation to MMC, had allegedly kept the books and accounts of MMC in a careless and fraudulent manner so as to conceal its

irregular transactions, it was impossible to ascertain Cory's full damages.

Mitchell felt that this lawsuit constituted a vicious attack on his integrity and that he was required to defend to the utmost his business reputation in order that he might continue his work in the business world. Also, when the general counsel of Fulton Industries learned of the Cory v. Mitchell lawsuit, he expressed his grave concern to Mitchell. He pointed out that Fulton was a publicly-held company, the stock of which was about to be listed on the American Stock Exchange, and it was hoped by all concerned that it would eventually have a listing on the New York Stock Exchange. He advised Mitchell that, if the Cory charges against him were proven, it would be necessary for Mitchell to resign from Fulton as one of its officers and directors. Mitchell replied that he was not guilty of any of the charges made by Cory, and he intended to defend the lawsuit to his last dollar. He retained the services of a large, well-known Chicago law firm, and the entire matter was bitterly contested in a long trial before the late Judge Sbarbaro of the Superior Court of Cook County.

On February 3, 1960, Judge Sbarbaro handed down an opinion finding the defendants, and specifically Mitchell, liable for fraud, intentional misrepresentations, and breach of warranty. However, he deferred fixing the total amount of damages. Judge Sbarbaro's opinion began as follows:

PLAINTIFF, Corey [sic] Corporation, seeks to recover *damages for fraud and breach of warranty* in connection with the plaintiff's purchase of all of the capital stock of the Mitchell Manufacturing Company, pursuant to the terms of a written contract dated November 7, 1955. * * * [Emphasis supplied.]

In his opinion, Judge Sbarbaro excoriated Mitchell for his part in the sale negotiations, and stated that:

The evidence overwhelmingly sustains the plaintiff's contentions that the books and records were not kept

in accordance with good accounting practices and that the Defendants deliberately and willfully concealed vital information from the Plaintiff for the purpose of inducing the Plaintiff to purchase their stock and succeeded in doing so.

While the opinion dealt only with liability and deferred determination of the total amount of Cory's damages, there are figures referred to by Judge Sbarbaro in his opinion clearly indicating that he contemplated the entry of judgment against Mitchell and the other defendants far in excess of the $1,564,209.24 sales price paid by Cory for the MMC stock.

After the opinion was filed, but before any further proceedings could be had, Judge Sbarbaro was killed in an airplane accident. Shortly thereafter, in February 1960, the litigation was settled by the payment of $1 million to Cory.

Negotiations leading to this settlement appear to have come about at the suggestion of Cory's president. Mitchell had been shocked when he saw Judge Sbarbaro's opinion and findings, and his first reaction was to appeal the decision. However, after discussing the matter with his wife and other members of the family, it was decided that he had been through so much in this litigation that settlement should be attempted.

On February 12, 1960, an agreement prepared by Mitchell's lawyer was entered into between all the former stockholders of MMC. This agreement spoke in terms of reducing the purchase price of the MMC stock in the amount of $1 million and provided that Mitchell was to pay $678,000 of that amount, which was nearly $20,000 more than he had received for his MMC stock.

The settlement agreement between Mitchell and Cory also spoke in terms of reducing the purchase price paid for the MMC stock. It set forth the manner of repayment, required Cory to dismiss the pending litigation with prejudice, and to cooperate in procuring the expunging from the record of Judge Sbarbaro's opinion. On March 22, 1960, the Superior Court of Cook County dismissed the case and ordered that Judge Sbarbaro's opinion be expunged from the record.

In defending this lawsuit, Mitchell paid legal and accounting fees of $133,564.16 in 1959, and $1,776.36 in 1960, and he deducted those amounts as ordinary deductions in his income tax returns for those years. The Commissioner of Internal Revenue determined that the expenses were capital expenditures, directly related to the 1955 sale of the MMC stock, which determination resulted in a net deficiency for the two years amounting to some $86,600. Mitchell paid that amount and filed a timely claim for refund. The claim was disallowed and this suit followed.

■ On this record there can be little doubt that Mitchell's primary trade or business has always been that of being a corporate official. Such an activity constitutes the "carrying on" of a trade or business within the meaning of section 162(a). See Hochschild v. Commissioner, 161 F.2d 817 (2d Cir., 1947). But this, of course, does not end the inquiry. The question remains as to whether Mitchell incurred the disallowed expenses in carrying on his business, or whether, as the Government contends, the expenses were incurred in connection with a capital transaction, i.e., the sale of MMC stock to Cory, and, hence, were nondeductible capital expenditures.

■ It is true, of course, that had it not been for the 1955 sale of MMC stock to Cory, there would have been no lawsuit, and Mitchell would have had no occasion to incur the litigation expenses in question. However, the Government's automatic application of some sort of "but for" rule to this fact reflects a misunderstanding of the real issues involved in Cory v. Mitchell. Because of its concentration on the 1955 stock sale rather than on the nature of the issues in the ensuing litigation, the Government has experienced that "Pavlovian reflex" which Judge Davis has warned us against in California & Hawaiian Sugar Refining Corp. v. United States, 311 F.

2d 235, 243, 159 Ct.Cl. 561, 574–575 (1962), when he said:

> The rule that legal expenditures are non-deductible when made in connection with certain "capital" transactions does not mean that, by a Pavlovian reflex, they must always be non-deductible when "capital" is involved, though the transaction and occasion differ radically.

The Government argues that the object of Cory's suit was to obtain an adjustment of the purchase price which it had paid for the MMC stock. Clearly, this was not so. As was fully recognized by Judge Sbarbaro, Cory's complaint was for damages for fraud and breach of warranty, and had nothing to do with title to the MMC stock, adjusting its purchase price, rescinding the transaction, or reforming the sales agreement. *Cf.* Manufacturers Hanover Trust Co. v. United States, 312 F.2d 785, 160 Ct.Cl. 582 (1963), cert. denied, 375 U.S. 880, 84 S.Ct. 150, 11 L.Ed.2d 111 (1963). Indeed, the total amount of damages claimed by Cory far exceeded the amount which it had paid for the MMC stock. Particularly is it obvious in Count II of Cory's complaint that the real thrust of Cory's action was alleged fraudulent misrepresentations by Mitchell and a breach of his fiduciary obligations to MMC *in his capacity as its president and director*.[2] Surely it is obvious that such allegations, if proved, could have a disastrous impact on Mitchell's business career as a corporate officer. Understandably, this was his major concern, and it is small wonder that he advised the worried general counsel of Fulton Industries[3] of his intention to defend the lawsuit "to his last dollar." At this point, Mitchell's position was analogous to that of the broker who was put to the cost of defending a lawsuit wherein he was charged with "churning" the portfolio of a trust under his supervision simply for the purpose of increasing his commissions. His expenses incurred in resisting the claim were held deductible under section 162. Ditmars v. Commissioner of Internal Revenue, 302 F.2d 481 (2d Cir., 1962).

The Government insists, however, that United States v. Gilmore, 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963) has conclusively established the principle that whether litigation costs of resisting a claim are "business" or "personal" must depend (in the words of the Supreme Court):

> [O]n whether or not the claim *arises in connection with* the taxpayer's profit-seeking activities. It does not depend on the *consequences* that might result to a taxpayer's income-producing property from a failure to defeat the claim * * *. At p. 48, 83 S.Ct. at p. 629.

But the Government has overlooked the crucial point in *Gilmore* which is emphasized throughout the opinion. The "claim" which the taxpayer in that case had resisted was a divorce action, surely a most "personal" type of lawsuit. As the Court put it:

> We turn then to the determinative question in this case: did the wife's claims respecting respondent's stockholdings arise in connection with his profit-seeking activities?
>
> * * * * * *
>
> In classifying respondent's legal expenses the court below did not distinguish between those relating to the claims of the wife with respect to the *existence* of community property and those involving the *division* of any such property. *Supra*, pp. 41–42. Nor is such a breakdown necessary for a disposition of the present case. *It is enough to say that in both as-*

---

2. Had he been sued solely as one of the corporate shareholders, his liability seemingly would have been limited to the amount received by him for his stock. See, Allied Chemical Corporation v. Randall, 321 F.2d 320 (7th Cir., 1963).

3. It will be recalled that, at this time, Mitchell was an officer and director of Fulton Industries and that the filing of the Cory complaint had placed his position with that company in jeopardy.

*pects the wife's claims stemmed entirely from the marital relationship, and not, under any tenable view of things, from income-producing activity.* [Emphasis partially supplied.] At p. 51, 83 S.Ct. at p. 631.

By contrast, in the present case, the issues raised by Cory's claims against Mitchell not only arose out of his "profit-seeking activities," they placed his business career in grave jeopardy. Accordingly, it must be clear that the fees paid by him fall within the category of "expenses resulting from the defense of a damage suit based on malpractice, or fraud, or breach of fiduciary duty" and, as such, are deductible under section 162. Commissioner of Internal Revenue v. Heininger, *supra*, 320 U.S. at page 472, 64 S.Ct. at page 253.

The Government relies strongly on the fact that in the settlement agreement entered into between Cory and the Mitchell group after Judge Sbarbaro had rendered his decision, the parties themselves referred to their settlement as a reduction of the purchase price for the MMC stock. Moreover, the Government points to the fact that in his 1960 income tax return Mitchell himself treated the amount paid by him under the settlement agreement as a "reduction of the selling price" of the MMC stock. See finding 15. The Government says these facts add up to an admission by Mitchell that the entire transaction was capital in nature and accuses him of inconsistency in treating his legal expenses differently than his settlement payment.

■ There is, however, no inconsistency. The difficulty with the Government's argument is its apparent assumption that the disallowed expenses were connected with the settlement. The record is quite to the contrary. Mitchell incurred the expenses in question by employing lawyers and accountants to defend him against the charge that he had defrauded Cory and MMC, a claim which he regarded as endangering his business career of corporate official. That his defense before the trial court was unsuccessful is unimportant. Commissioner of Internal Revenue v. Tellier, *supra*.

Since Mitchell's trial expenditures were unrelated to the settlement negotiations which followed after the adverse Sbarbaro opinion, in my judgment, he was entitled to treat the two differently.[4] In this light, the nomenclature developed by the parties during the give-and-take of settlement negotiations to describe the reason for their settlement becomes irrelevant to a determination as to the nature of expenses incurred for an entirely different reason.

■ In support of its position, the Government relies heavily on the cases of Arrowsmith v. Commissioner of Internal Revenue, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952); Towanda Textiles, Inc. v. United States, 180 F.Supp. 373, 149 Ct.Cl. 123 (1960); Munson v. McGinnes, 283 F.2d 333 (3d Cir., 1960), cert. denied, 364 U.S. 880, 81 S.Ct. 171, 5 L.Ed.2d 103 (1960); Spangler v. Commissioner of Internal Revenue, 323 F.2d 913 (9th Cir., 1963); and Rees Blow Pipe Mfg. Co. v. Commissioner of Internal Revenue, 342 F.2d 990 (9th Cir., 1965). The reliance is misplaced and no doubt stems from defendant's insistence on looking solely at the settlement transaction and ignoring the litigation before Judge Sbarbaro as to which the disallowed expenses were incurred. It would lengthen this opinion unnecessarily to discuss each of these cases, for all apply the *familiar principle of tax law that legal expenses incurred*

---

4. In this connection, it is fair to note that, since Mitchell's share of the settlement payment to Cory was considerably more than he had originally received for his MMC stock, he conceivably might have been entitled to claim an ordinary loss to the extent of the excess. *Cf.* Commissioner of Internal Revenue v. Switlik, 184 F. 2d 299 (3d Cir., 1950). However, Mitchell did not take any such deduction on his 1960 tax return but merely computed his 1960 tax liability by making the allowable adjustments under section 1341.

in lawsuits which involve only the transfer of capital assets must be capitalized and, for tax purposes, merely constitute an addition to the basis of the assets. As has been shown above, this rule is simply not applicable to the facts of this case. One of the defendant's cases may be singled out to show the distinction which is equally applicable to all.

In Munson v. McGinnes, for example, the fees involved were paid for professional services in winning a litigated controversy about a sale of the stock of Williamsport Wire Rope Co. to Bethlehem Steel Co. The taxpayer was one of the selling stockholders. A few years later he and the other former Williamsport stockholders brought a suit to set aside the sale claiming that Bethlehem had defrauded them. The trial court found in their favor. Pending disposition of a motion for new trial, Bethlehem and the former stockholders, including the taxpayer, agreed to settle the controversy by Bethlehem paying an additional $6,000,000 to the Williamsport group. The taxpayer reported his share of the additional amount as capital gain and claimed a deduction for his legal fees under section 212. The court sustained the Government's disallowance of the deduction and treated the litigation expenses as capital expenditures. In so holding, the court said:

> Here there was no dispute as to what the original terms of sale were and no difficulty in obtaining the buyer's compliance with them. Rather, there was a successful effort to establish that the original terms of sale were so unjust as a result of underlying fraud that equity should require their modification to provide the seller a larger consideration. We need not say * * * that the seller reacquired and resold the stock to conclude that *what occurred was in substance and reality an equitable revision of the original terms of sale.* Thus, the counsel fee in question was, to one in the seller's position, an expense of modifying terms of sale, incurred as an essential incident of a capital transaction in the disposition of property. [Emphasis supplied.] 283 F.2d 335.

Unlike *Munson*, however, the issues litigated in Cory v. Mitchell did not involve "an equitable revision of the original terms of sale." Cory went for much bigger game alleging that, because of Mitchell's fraudulent misrepresentations, it was entitled to damages in excess of $3,700,000, considerably more than twice the amount Cory had paid for the MMC stock in the first place. To reiterate, it was in his unsuccessful defense of those charges that Mitchell incurred the expenses in question. The fact that later Cory and Mitchell settled their dispute on the basis of revising the stock purchase price is of no moment.

On the basis of the above opinion, plaintiffs are entitled to recover with the amount of recovery to be determined pursuant to Rule 47(c).

NICHOLS, Judge (dissenting):

The question to be decided here is whether the Mitchells, plaintiffs, may deduct legal and accounting fees incurred in defending a lawsuit as ordinary and necessary expenses incurred in carrying on a trade or business (I.R.C. of 1954, Sec. 162) or as expenses for the management, conservation or maintenance of property held for the production of income (I.R.C. of 1954, Sec. 212) or whether such items were capital expenditures. The majority hold in plaintiff's favor and I respectfully disagree. The facts are largely stipulated, and wholly so for practical purposes, since the three witnesses were all called by plaintiffs and were subjected to but little cross-examination. Nevertheless, I think some of the court's fact conclusions are badly erroneous, particularly Ultimate Finding 20, that Mitchell's defense of the lawsuit was directly connected with his trade or business of being a corporate official. I think if the facts are correctly understood, the application of the laws to them is relatively free from difficulty. Therefore, most of this discussion is directed to the

facts. I do not repeat the whole history of the case, but refer the reader to the opinion of our commissioner, adopted by the court, and the findings. I accept both as correct except where I point out errors hereinafter.

## I

At the outset one has to put aside as irrelevant the possibility that recovery against Mitchell in the amount claimed in the suit, upwards of $3,700,000, would by its mere magnitude have interfered with his trade or business. First, no showing was made whether his resources, even after being mulcted of so large a sum, would or would not have remained sufficient to carry on his trade or business. Second, for expenses of litigation to be deductible under § 162, *supra*, there has to be some *nexus* other than that, between the lawsuit and the trade or business. This is the clear holding and principle of United States v. Gilmore, 372 U.S. 39, 83 S.Ct. 623, 9 L. Ed.2d 570 (1963). There the Supreme Court held fees and expenses, in defending a divorce action, were merely personal and not deductible under § 162, although defeat would have in all probability cost that taxpayer his control over three General Motors dealership franchises, constituting his trade or business. The Court said at p. 49, 83 S.Ct. at p. 629:

> * * * the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the furtunes of the taxpayer, is the controlling basic test of whether the expense was "business" * * *

The principle extends to other than pecuniary consequences: Mr. Gilmore also feared his wife's sensational allegations about his sex life might cause General Motors management to cancel his franchises even if he did not lose stock control of his companies. In order to test the validity of the supposed *nexus* here, it is necessary to consider the nature of Mr. Mitchell's business and the nature of the lawsuit.

## II

Mr. Mitchell's business, the parties agreed, was that of "corporate official" but the term requires definition. His testimony covers his business activities from 1947 to the trial of the case in 1966. It is clear he never purported to be and never was one of those corporate executives who for compensation manage and operate concerns in which they have no substantial equity or financial control. He was equally uninterested in investing where he would be a mere powerless minority stockholder. Mr. Mitchell's business up to November, 1955, was as President of Mitchell Manufacturing Company, a 100% family owned corporation, which he had built up from small beginnings with no capital but his own and his mother's, and undoubtedly he had been accustomed to managing all its operations. That he had expertise as a builder of lighting fixtures and window air conditioners is shown by his covenant to Cory, included in the November 7, 1955, selling agreement, not to engage in those businesses for three years. In selling the stock of Mitchell Manufacturing Company he terminated his business along those lines.

While he was still running Mitchell Manufacturing Company, he acquired control of two steel companies, as well as a shopping center and other real estate in the Chicago area. After selling the Manufacturing Company, he established a Chicago office, becoming "active with" a financial group, consisting of New York financiers Jay Levine and David Berdon, with others of lesser note. This was a new and different business. His function apparently was to locate companies they could acquire and control, advise investment in them, and, of course, personally join in such investment. They started in 1956 with Landis Machine Company of St. Louis. They bought out the majority stockholders who were "some widows" and Mr. Mitchell became Chairman of the Board. He received executive compensation from Landis in 1956, 1957, and 1958. Also in 1956, they acquired Fulton Bag

& Cotton Mills. They changed its name to Fulton Industries, and changed the nature of its business. Through it they acquired a number of other companies in variegated lines, making them either operating divisions or subsidiaries of Fulton Industries. Mr. Mitchell became first Secretary-Treasurer and then President of Fulton, but his duties did not require him to change his office and residence from Chicago to Atlanta, Georgia, the headquarters of Fulton. He received executive compensation from Fulton from 1956 on, $25,000 in 1959. Also in 1956, they acquired Sidney Blumenthal and Company, a manufacturer of synthetic furs and pile fabrics, of Rocky Mount, North Carolina.

Next followed, a shopping center-apartment building combination in Chicago. Mr. Mitchell was the largest participant, managed it, negotiated the mortgage loan, and rented out the shopping center.

In 1958 the syndicate acquired the Magnus Organ Co., Livingston, New Jersey, which made electric organs, a small losing company on the verge of bankruptcy. Mr. Mitchell produced a profit of $2,500,000 before taxes, at the end of the first fiscal year thereafter. In 1959 he derived from Magnus the astounding total of $178,000, in executive compensation, plus $65,667 in dividends. He disposed of Landis and Sidney Blumenthal, and Magnus later on, buying into others that need not be named. To illustrate their variety, however, there were included companies making wigs, and facial saunas. The continued use of the term "corporate official" does not suffice to disguise the fact that his job for the syndicate was quite different from that with Mitchell Manufacturing. The geographical distribution of the companies, and the variety of their activities, negative any idea that he could have managed them in the ordinary sense. Mr. Cohen testified what Mr. Mitchell did for Fulton Industries, and it was mainly in the area of acquiring new subsidiaries or operating divisions, and other major financial transactions.

Such were Mr. Mitchell's businesses. I think the opinion and findings are incomplete in failing to make it clear that Mr. Mitchell's renumerative employment as a corporate official, properly so-called, rested on a solid foundation of financial control, from which indeed, it was a byproduct. Perceiving this, one might perceive some incongruity in the picture of Mr. Mitchell, the controlling stockholder, becoming so appalled at the poor showing of Mr. Mitchell in the Cory litigation, that he refuses any longer to employ Mr. Mitchell as President.

III

The complaint in the Cory suit was filed in December, 1958, in the Superior Court of Cook County, Illinois, and was stated to be "In Chancery." It names as defendants our plaintiff, Mr. Mitchell, other former stockholders of Mitchell Manufacturing Company, members of his family, trustees who had held stock for members of his family as beneficiaries, and a Mr. Solomon who had been Secretary-Treasurer but had held no stock. Our plaintiff relies on the naming of Mr. Solomon to show that the action was not merely one to reduce the stock price. But the naming of the concededly innocent minority stockholders and trustees is inconsistent with any other theory, and it appears the pleader followed no single criterion in the choice of parties defendant. Mr. Solomon is admitted not to have contributed to the settlement, nor to the compensation of counsel who defended the case.

Count I of the complaint alleges various deceptions knowingly practiced by Mr. Mitchell and Mr. Solomon on the Cory representatives with respect to the net worth and liabilities of the Mitchell Manufacturing Company, in the negotiations to sell it to Cory. Damage totalling $3,700,000 is asserted, which compares with $1,500,000 Cory paid for all the Mitchell stock. Cory could have been hurt by more than it paid, because its first act on taking over the stock was to merge Mitchell Manufacturing into it-

self, and thus it assumed Mitchell's liabilities, which, if the complaint allegations were all true, exceeded the assets.

Count II alleges breach by Mitchell and Solomon of their fiduciary duty towards the corporation, but the specific acts of wrong doing alleged are for the most part the same as those in Count I, which are incorporated by reference. The theory of the pleader is to me somewhat obscure, and it seems he was mostly thinking about keeping his options open.

Counsel have not put before us the answer and other papers in the Cory suit. We know from Judge Sbarbaro's opinion, the stipulation, Mr. Mitchell's testimony, and admissions by counsel before us, that the trial was in open court, bitterly contested prolonged, with 6,000 pages of testimony and numerous exhibits. The Judge rendered his opinion February 3, 1960. He starts out by summarizing plaintiff's contentions which he says were first that defendants breached a warranty to plaintiff in the sales agreement of November 7, 1955, and second, that they defrauded the plaintiff by deliberately concealing large liabilities. Neither of these sound like Count II and it seems to follow that Count II must have dropped out of the case earlier, but whether at the pre-trial, the opening statement, or at some other time, does not appear. Counsel here on both sides seem to agree that Count II posed a more direct threat to Mr. Mitchell's livelihood as a corporate official than Count I, but if any of the attorney's fees involved are to be allocable to Count II, we should know whether any of the services of counsel were directed at knocking Count II out of the case. I.e., did it disappear into limbo because of Mr. Mitchell's counsel's moves? This we do not know. The burden on plaintiff in this respect is not sustained. The theory of the Cory suit, for our purposes, therefore is that asserted in Count I and adjudicated in Judge Sbarbaro's opinion, to which counsel's efforts were manifestly directed to defeating. Plaintiff's alleged liability as set forth in both places arose directly out of a capital transaction, his sale of the stock of Mitchell Manufacturing Company. It is true that he might have been held liable for more than the entire purchase price of the stock and did ultimately contribute more to the settlement than he received for his own stock. Still, the relief sought, if not limited to recission or reformation, was like them essentially equitable.

I agree that the issues in the Cory suit cannot be ascertained from the settlement. It was a compromise. Things looked bleak for Mr. Mitchell on promulgation of Judge Sbarbaro's opinion, but he must have held some high cards not made manifest to us. Our commissioner calls the defense unsuccessful, but the measure of success is the difference between the $2,700,000 apparently awardable under the expunged opinion and $1,000,000 actually paid. This kind of settlement was always possible within the issues tendered by plaintiff's complaint and the equitable jurisdiction invoked by it.

IV

The expressions and findings of the commissioner, adopted by the court, indicate his belief that Mr. Mitchell defended the suit so as to defeat the menace he thought it posed to the business he was then engaged in. The opinion says the charge he had defrauded Cory and Mitchell Manufacturing Company, was a claim

"which he regarded as endangering his business career of a corporate official."

and that he was

"required to defend to the utmost his business reputation in order that he might continue his work in the business world" (See also Finding 11.)

Mr. Mitchell took the stand and he never said this. He said:

"This [the suit] was a stunning blow to my reputation which at least I felt was impeccable."

The suit achieved this just by being filed. Later on, alluding to Count II, counsel asked if that had a bearing on his defending the suit. The answer was:

"Well, sir, at that time I was an officer, as I pointed out, of several publicly owned companies, and it would have been incompatible for me to have continued my work as a corporate officer in a public company and associated with the fine people I am associated with, in the face of a situation such as this, when I would be found guilty of the kind of thing I was accused of here."

He would have defended the suit without Count II, he said. It appears that Mr. Mitchell saw *in Count II* a menace, not to his business activities in their totality, but only to his standing in front as an officer of a publicly held company. I have already indicated I do not see proof in the record that any legal services were rendered in defeating Count II. Moreover, Mr. Mitchell indicated in his testimony which of his companies were publicly held at the time of the suit. They were Fulton, Landis, and Sidney Blumenthal. Magnus Organ, his most successful operation at that time, and the real estate ventures were not publicly held. Thus, even if legal expenses were incurred in defeating Count II, it cannot be said there is any evidence that an adverse finding on it would, in Mr. Mitchell's view, have really crippled his business activities. His testimony seems carefully thought out and he does not appear to have said more or less than he meant. No doubt the blow to his pride was terrible, but the tangible menace to his business was not seen by him in at all the way our commissioner imagines, and the latter's statements lack support in evidence.

Plaintiff put on the stand I. T. Cohen, Esquire, an Atlanta lawyer. Apparently the purpose was to account for and corroborate Mr. Mitchell's testimony already quoted. Mr. Cohen said he first became connected with Fulton in 1956 through representing a local group who had contracted to buy a controlling interest in its stock. They decided to sell in turn to the Mitchell-Levine-Berdon syndicate and sent him to New York to negotiate with them. Civic-minded local interests concerned were anxious that the business be in good hands and that its main plant remain in Atlanta. He investigated Mr. Mitchell most carefully and found his reputation for ability and integrity to be the highest. After the takeover Mr. Cohen became General Counsel. In 1959, upon learning of the Cory litigation, and that Mr. Mitchell was charged with fraud, he called him, apparently on the telephone. Mr. Mitchell denied any fraud and said he would defend the suit to his "last dollar." Mr. Cohen then said:

"Well it would be of serious consequences legally with the SEC, we are a publicly owned company, we are going to have stock listing on American and hope to get on the Big Board, and there are rules, you know, if you are found guilty of fraud, either civil fraud or criminal, you have to be removed from the Board * * *"

There was more, but the above is the heart of it. We have examined the rules and regulations of the SEC and do not find any pronouncement to which the above could have alluded. Counsel have referred us to none. The reader will note Mr. Mitchell had already decided to defend the suit to his "last dollar" before he received this advice. Our commissioner erroneously makes it appear the advice preceded the decision. Mr. Cohen kept in touch with the progress of the litigation. On learning from Mr. Mitchell of the Sbarbaro opinion he advised that to avoid resigning Mr. Mitchell would either have to appeal or get the opinion expunged. He was satisfied that the actual expunging, when it occurred, eliminated any adverse effect on Fulton Industries.

The problem he says was magnified because New York banks which financed the enterprise had been promised that Mr. Mitchell would remain with Fulton and the contract with them provided

that withdrawal of Mr. Mitchell would be a default. I see this, however, as an implausible hobgoblin, for if Mr. Mitchell's reputation had really taken a plunge, surely the banks would have been only too glad to get him out of company management.

Mr. Cohen further testified that the Sbarbaro opinion, had it stood would have had a generally disastrous effect on Mr. Mitchell's career as a businessman and investor. There is no evidence, however, that this analysis was communicated to Mr. Mitchell and was known to him when he incurred the involved legal expenses, or later. As already noted, Mr. Mitchell himself did not testify he saw the situation thus.

The third plaintiff's witness was Mr. Samuel Stern, who knew Mr. Mitchell through being a supplier to Magnus Organ. He too had a high opinion of Mr. Mitchell. He heard of the suit during its pendency but it did not affect his opinion. However, other people who knew Mr. Mitchell less well also heard of it and it did arouse mistrust among them. After the settlement the rumor got around that Mr. Mitchell had settled for a million dollars, and thereafter the adverse talk "sort of died down."

It may be thought that Mr. Cohen's analysis of the situation is so much the obvious one it could be imputed to anyone. Possibly this is why our commissioner attributes Mr. Cohen's views to Mr. Mitchell, as it seems to me in substance he does. It is, however, Mr. Mitchell's purpose in incurring the involved legal expenses that we are ascertaining, not anyone else's. Not everyone views judicial pronouncements as we lawyers do. There are, I believe, some businessmen and financiers who do not automatically conclude that a trial judge's adverse observations about a person they know and respect, are necessarily factual. They do not assume that every law suit has a just outcome. A lawyer may feel he cannot bear the disapprobation of a judge; a businessman may be relatively indifferent to it. The court is, I believe, on shaky ground in

ascertaining Mr. Mitchell's purpose from any source other than his testimony and his actions.

Mr. Mitchell did not testify what instructions he gave his trial counsel in the Cory suit. They did not testify, except by their actions, what instructions they were given. Their actions were, so far as our record shows, that the suit was made ripe for trial promptly and it was tried in open court, in Chicago, Mr. Mitchell's home city and headquarters. So far as appears, the press could have walked in daily and heard the testimony about Mr. Mitchell's alleged iniquities, which was afterwards the basis of Judge Sbarbaro's devastating opinion. There was not so far as appears, even the suggestion of a settlement discussion. Mr. Mitchell saw the suit, he says, as "a very vicious attack on my character and my integrity" and his combative instincts were aroused. The plaintiffs in that case apparently did not for the nonce care if, in picturing Mr. Mitchell as lying and deceitful, they portrayed themselves as negligent and gullible custodians of their stockholder's funds. It looks as if they did not realize the possible boomerang nature of their claim until they read Judge Sbarbaro's opinion. Then they took the initiative in proposing a settlement and, *for the first time,* settlement discussions took place. They settled for about forty cents on every dollar Judge Sbarbaro would have awarded.

Mr. Cohen, in Atlanta, Georgia, first heard about the suit, and that the issue was fraud, from a Mr. Epstein, apparently a mere gossiper not connected with the litigation in any way. Mr. Stern heard, apparently from many sources, that the business community had come to mistrust Mr. Mitchell. One wonders what harm the promulgation of the Sbarbaro opinion would have caused to Mr. Mitchell's reputation as a corporate official that the months of testimony in open court had not already inflicted.

For present purposes, the point is that the record affords no substantial evidence, either in the attitude of Mr.

Mitchell as shown in his testimony, in the undisclosed instructions he gave to trial counsel, or in their conduct of the litigation, to show that they were retained and compensated primarily to protect Mr. Mitchell's image as a corporate officer. This is written with due regard to the fact that defense counsel are not in sole control of litigation, but with reference to the resources we may, as experienced lawyers, take notice that counsel had, should the client have given a clear directive to make use of them. With Mr. Mitchell's natural resentment, and the $3,700,000 apparently at stake, it is not surprising if they should have understood their duty to be to go in and win, let the chips fall where they might. The possibility that, because of the SEC, Mr. Mitchell might have had to step aside as a corporate officer, apparently related in his mind to Count II and we have no proof what if any legal fees were paid to defeat Count II. The consideration came as an afterthought, when the decision to offer forensic combat had already been made. And the alleged practice of the SEC has not been put before us in a clear cut way which would enable us to evaluate its impact on Mr. Mitchell's position in companies other than Fulton Industries. As to that company, he would if he had stood aside as officer still have owned approximately 102,000 shares, worth over $1,000,000, and it seems reasonable he would have remained a power in its affairs.

## V

Thus my analysis of the trial transcript and exhibits generate the conclusion that the legal expenses here involved were not shown to have been incurred to defeat Count II of the Cory complaint nor to protect plaintiff's trade or business of corporate official, as it was from December, 1958, when the Cory suit was brought, to February, 1960, when the Sbarbaro opinion was expunged. The purpose of the expenditure was to defeat a claim under Count I for fraudulent misrepresentation and breach of warranty, in connection with a sale of corporate stock, itself a capital transaction having capital gains treatment under the tax laws.

The case I have found most nearly in point is Rees Blow Pipe Manufacturing Co., 41 T.C. 598 (1964), aff'd. per curiam, 342 F.2d 990 (9th Cir. 1965). The issue was the deductibility of legal expenses incurred in opposing a suit in a state court for willful or negligent misrepresentation or fraudulent concealment of defects. Rees Blow Pipe had transferred certain real property to the plaintiff in the state court proceedings as part of a taxfree three-way exchange of real property, constituting a capital transaction. The state court plaintiff found the property it received unsuited for the garage use it had intended. Rees Blow Pipe, it alleged, had misrepresented the zoning classification of the building and fraudulently concealed the absence of walls, and building code violations. The state court awarded damges of $20,000. In the Tax Court Rees Blow Pipe argued that the legal expenses were an ordinary and necessary expense under § 162, or a loss under § 165. The Tax Court rejected both contentions, holding that the award, and the fees, were deductible as capital losses only. It held, and the Court of Appeals agreed, that they "take on the character of the three-way agreement * * *" 342 F.2d at p. 991.

Munson v. McGinnes, 283 F.2d 333 (3rd Cir.), cert. denied, 364 U.S. 880, 81 S.Ct. 171, 5 L.Ed.2d 103 (1960) is in point to a lesser degree. It involves counsel fees of a defrauded seller, not a seller who was accused of fraud, but the statute involved is § 212, which the court states to be in *pari materia* with § 162. Taxpayers complained about a fraudulent receivership of a company in which they held stock, leading them to sell the stock at less than its fair value. They sued to have the sale declared fraudulent and asked that the company's assets be traced, identified, and returned. In a compromise approved by the court, the buyer paid these stockholders $6,000,000 more. The court in

the tax case said there was in substance an equitable revision of the original terms of sale. The fees were held to be a capital expenditure. Spangler v. Commissioner of Internal Revenue, 323 F.2d 913 (9th Cir. 1963), likewise involves legal expenses of a defrauded seller. Taxpayer recovered from the buyer amounts equal to dividends paid after the sale, the equivalent to a liquidation payment on the stock, and interest. The court cites *Gilmore, supra,* and says that its principle is likewise applicable when an attempt is made to deduct capital expenditures as ordinary and necessary business expenses. (At p. 919). Hochschild v. Commissioner of Internal Revenue, 161 F.2d 817 (2d Cir. 1947), indicates a distinction and a different rule where the counsel fees are incurred in defense against charges of misconduct by a corporate officer in administering corporate affairs. Note especially the partial dissent by Judge Jerome Frank. In concluding, as I do, that counsel fees herein are not shown to have been incurred in defense against Count II, that case is eliminated as an applicable precedent. So too with Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966) and cases cited therein. *Tellier* involves counsel fees in defense against charges that taxpayer, a securities underwriter, violated various criminal fraud statutes in connection with his underwriting.

I see the above authority as really answering the problem of this case, but one factual difference requires further notice. Mr. Mitchell had an "exposure" here that considerably exceeded the price Cory paid for the stock. This, says plaintiff, takes the case out from under precedents such as Munson v. McGinnes, *supra,* which see the counsel fees as capital expenditures in nature because directed to an equitable revision of the original terms of sale. Plaintiff does not see it as possible that the relief sought could be deemed such a revision when it would reduce the original purchase price to less than zero.

However, the relief sought was equitable and it was always possible that in the event of a partially successful defense a court of equity would grant relief by reducing but not eliminating the purchase price. The settlement actually made was inherent in the case all along, and not a completely novel approach as plaintiff would have us believe. The difference in the nature of the equitable relief that might have been required if all Cory's demands were met, does not go to the "origin and character of the claims" which under *Gilmore, supra,* is the "controlling basic test," and not "its potential consequences upon the fortunes of the taxpayer." Moreover, even if all of Cory's original demands were met, that would likewise be a revision of the original terms of sale in that those terms would in effect be modified to transfer the liability for excise taxes, etc. from Cory back to the seller. In Arrowsmith v. Commissioner of Internal Revenue, 344 U.S. 6, 73 S.Ct. 71, 97 L. Ed. 6 (1952), there was involved a transferee liability of two taxpayers. One of them alone was also liable as he had secretly profited from a breach of his fiduciary relationship. In that capacity he would have been liable for all of the transferor's debt. The two taxpayers, however, each paid half. The Court held at p. 9, 73 S.Ct. 71, that both must alike be denied a business loss deduction, and that the second could not claim a different tax treatment because of a greater potential loss that did not materialize.

It seems to me there is ample ground for treating the defense of the Cory suit as one to preserve and protect property even though the property might have been exhausted with Mr. Mitchell's liability still not fully satisfied.

The parties cite some decisions of this court: Towanda Textiles, Inc. v. United States, 180 F.Supp. 373, 149 Ct.Cl. 123 (1960); Allied Chemical Corp. v. United States, 305 F.2d 433, 158 Ct.Cl. 267 (1962); California & Hawaiian Sugar Refining Corp., Ltd. v. United States,

311 F.2d 235, 159 Ct.Cl. 561 (1962); Manufacturers Hanover Trust Co. v. United States, 312 F.2d 785, 160 Ct.Cl. 582, cert. denied, 375 U.S. 880, 84 S.Ct. 150, 11 L.Ed.2d 111 (1963); Union Bag-Camp Paper Corp. v. United States, 325 F.2d 730, 163 Ct.Cl. 525 (1963). I do not find anything in these cases inconsistent with the views herein expressed.

The test for deductibility under § 212 is the same as that under § 162, so far as concerns the present controversy. *Gilmore, supra.* Therefore, it need not be considered separately.

I would hold for the defendant and dismiss the petition.

DAVIS, J., joins in the foregoing dissenting opinion.