BILL E. McKAY, JR. AND LANA S. McKAY, PETITIONERS
v. COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 3289–92, 11987–92.[1]   Filed March 28, 1994.

---

[1] Docket No. 3289–92 relates to taxable years 1983 and 1984. Docket No. 11987–92 relates to taxable years 1985, 1986, 1988, and 1989. Upon joint motion by the parties, docket No. 3289–92 and docket No. 11987–92 were consolidated for trial, briefing, and opinion.

*Scott R. Cox,* for petitioners.
*Aubrey C. Brown,* for respondent.

WELLS, *Judge:* Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes:

| Year | Deficiency | Additions to tax sec. 6651(a)(1) |
|------|-----------|----------------------------------|
| 1983 | $14,588 | -0- |
| 1984 | 22,340 | $2,297 |
| 1985 | 29,156 | 7,039 |
| 1986 | 30,527 | 7,375 |
| 1988 | 3,571,867 | -0- |
| 1989 | 101,636 | -0- |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[2] the issues we are asked to decide relate to the settlement of claims petitioner Bill McKay (hereinafter

[2] Petitioners conceded that Mr. McKay had an additional $10,000 compensation income for taxable year 1983 based on his Form W–2. Petitioner also conceded adjustments to passive and nonpassive losses for taxable year 1989 from 9086, Inc., an S corporation of which petitioner

petitioner) made against Ashland Oil Co. The issues are: (1) Whether any portion of the settlement proceeds should be excluded from gross income pursuant to section 104(a)(2); (2) whether, and to what extent, legal and litigation-related expenses are deductible as ordinary and necessary business expenses under section 162; (3) whether petitioners paid $80,000 from an escrow account to a law firm for legal fees and costs during 1988; (4) whether petitioners are entitled to deduct other legal fees in the amount of $51,678 for taxable year 1988; (5) whether interest paid on loans incurred to pay legal expenses is deductible in 1988 under section 163; (6) whether petitioners are entitled to deduct $88,338 in expenses in taxable year 1989 for the maintenance and storage of business records; (7) whether petitioners are entitled to deduct certain other business expenses; and (8) whether petitioners are liable for additions to tax for failure to timely file their Federal income tax returns under section 6651 for taxable years 1984, 1985, and 1986.

### FINDINGS OF FACT

Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The stipulations and accompanying exhibits are incorporated in this opinion by this reference. Petitioners were residents of Kerrville, Texas, when they filed their petitions.

Petitioners are married and filed joint tax returns for the taxable years in issue. The instant case arises out of various legal proceedings involving petitioner and his former employer, Ashland Oil, Inc. (Ashland).

*Background*

Petitioner is a chemical engineer with specialized knowledge of the petroleum industry. He began his career in the petroleum industry during high school when he worked part time at an oil refinery in Detroit, Michigan. Upon receiving a college degree in chemical engineering, petitioner worked for Universal Oil Products Co. (UOP), where he became the youngest operating director in the history of UOP. After leaving UOP, petitioner took a position at Koch Refining Co. (Koch) and was promoted to plant manager for all Minnesota

---

is sole shareholder. In addition, the parties agreed to several computational adjustments.

activities. During 1976, Ashland recruited petitioner because of petitioner's expertise in the oil industry.

When Ashland first approached petitioner, petitioner was reluctant to take a position with Ashland because he was aware that Ashland allegedly had made various questionable disguised payments to domestic and foreign officials to secure oil during the 1960s and 1970s and had also made several illegal political contributions during the Watergate era. It was only after several of Ashland's senior officers guaranteed petitioner that such shady practices had stopped that petitioner agreed to make a career move to Ashland.

Petitioner's first position at Ashland was manager of process developments. Later, his job also encompassed helping Ashland's then chief operating officer, Orin Atkins (Mr. Atkins), with oil acquisition activities. During 1979, petitioner was appointed president of Ashland Development, a wholly owned subsidiary of Ashland which arranged all of its research and development. During 1980, petitioner's job expanded to include the handling of all crude oil supply acquisitions for Ashland.

During December of 1980, Mr. Atkins made arrangements for the payment of a $1.35 million bribe to Yehia Omar (Mr. Omar), an official of the Sultanate of Oman, for the purchase of its Government's oil. Mr. Atkins insisted that petitioner provide for the transfer of the funds to a Swiss bank, but petitioner refused. Petitioner protested making the transfer because it was his belief that such a payment was a violation of the Foreign Corrupt Practices Act (FCPA) as well as a 1975 consent decree that Ashland had made with the Securities and Exchange Commission (SEC). Despite petitioner's persistent efforts to prevent the $1.35 million transfer, the payment was made.

Even after the payment was completed, petitioner continued to raise the issue of the payment's legality with Ashland's management. Petitioner soon learned that Ashland was trying to retrieve the $1.35 million bribe from Mr. Omar, but only by making a payment to Mr. Omar so that Mr. Omar would return the $1.35 million and rescind the earlier deal. Petitioner similarly objected to the latter payment and attempted to prevent it.

As a consequence of petitioner's demands that Ashland comply with the law, Mr. Atkins threatened to fire petitioner

if he continued to challenge the disguised payments to Mr. Omar. Ultimately, during September 1981, Mr. Atkins was asked to leave Ashland, and he was replaced by John Hall (Mr. Hall). Mr. Hall assured petitioner that all disguised payments and bribes would stop. Despite Mr. Hall's assurances, Ashland continued to make disguised payments.

Because of the difficulties petitioner was having in his relationship with Ashland over the disguised payments, petitioner hired the law firm of Wilmer, Cutler & Pickering (Wilmer, Cutler) to help him negotiate a satisfactory termination to his employment at Ashland. Petitioner and Ashland were unable to reach a termination agreement that was acceptable to both parties.

During October and November of 1982, the Internal Revenue Service (IRS) contacted petitioner and requested that he respond to certain inquiries called the "Five Questions" regarding some of Ashland's business transactions. Ashland pressured petitioner to sign predetermined responses similar to the responses that Mr. Hall had already submitted to the IRS. Petitioner refused to sign such responses because he believed that the statements Ashland wanted petitioner to make were false. Instead, petitioner answered the questions as he deemed appropriate. His answers differed significantly from Ashland's predetermined responses.

During early 1983, Ashland sought outside counsel to gather information to terminate petitioner's employment. Later, during May of 1983, the SEC subpoenaed petitioner to testify about the payments made by Ashland to Mr. Omar and some of Ashland's transactions including the transactions discussed in petitioner's responses to the "Five Questions". Petitioner testified several times before the SEC.

During July 1983, a second-wave subpoena was served on Ashland by the SEC. Soon thereafter, Mr. Hall notified petitioner that he was being placed on involuntary leave effective immediately. Ashland officially terminated petitioner's employment by letter dated September 19, 1983. Petitioner received the equivalent of full salary until January 1, 1984.

*Petitioner's Wrongful Discharge Action*

One year after his termination, on September 18, 1984, petitioner initiated a wrongful discharge action against Ashland in the U.S. District Court for the Eastern District of Kentucky.[3] He retained the law firm Brown, Todd & Heyburn (Brown, Todd) to represent him in the wrongful discharge action.

Originally, petitioner sought relief under many legal theories including: Wrongful discharge, breach of employment agreement, a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), outrageous conduct causing emotional distress, harassment, conspiracy to perform illegal acts, intentional interference with petitioner's prospective economic relations, interference with petitioner's right to equal protection, defamation, and conspiracy to deprive petitioner of his privileges and immunities. Petitioner also sought punitive damages.

By the time of trial, however, the causes of action were limited to wrongful discharge, breach of contract, RICO violations, and punitive damages. Ashland filed counterclaims against petitioner in the wrongful discharge action alleging that he had breached his fiduciary duties to Ashland.

The wrongful discharge trial lasted 8 weeks. Ultimately, the jury found that Ashland had breached its employment contract with petitioner and had wrongfully discharged petitioner in violation of public policy.[4]

With respect to the breach of contract claim, the jury found that Ashland entered into an employment contract with petitioner under which petitioner could only be discharged for just cause. The jury also found petitioner was not discharged for just cause. With respect to petitioner's wrongful discharge claim, the jury found that the following factors substantially influenced Ashland in its decision to discharge petitioner: (1) Petitioner's refusal to tender the payment to Mr. Omar; (2)

---

[3] The case was entitled *McKay v. Ashland Oil, Inc.,* No. 84–291 (E.D. Ky.), which will hereinafter be referred to as the wrongful discharge action. Petitioner's wrongful discharge action was consolidated for discovery and for trial with a suit brought against Ashland by another former employee of Ashland named Harry D. Williams (Mr. Williams). The case was entitled *Williams v. Hall,* No. 84–149 (E.D. Ky.), which will hereinafter be referred to as the Williams case.

[4] The jury was instructed that under Kentucky law, "an employer may not discharge an employee if such discharge is in violation of 'public policy'". The trial judge defined a violation of public policy as a discharge "in retaliation for the employee's refusal to violate a state or federal statute."

his refusal to commit perjury in answering the IRS' Five Questions; and (3) his refusal to commit perjury when testifying before the SEC.

The jury awarded petitioner $1,602,103 as damages for lost compensation between January 1, 1984, and the date of the trial in 1988. The jury also awarded petitioner "future" damages in the amount of $12,846,209. The damages were trebled to more than $43 million for Ashland's violation of RICO. Finally, petitioner was awarded punitive damages for wrongful, malicious, and oppressive acts in the amount of $500,000 from Ashland and $750,000 from Mr. Hall.

*The Settlement Agreement*

After the jury award and judgment were entered, the attorneys for both parties met to negotiate a settlement. The discussions were hostile. Ultimately, however, on August 26, 1988, a settlement agreement (settlement agreement) was reached.

Ashland offered to pay petitioner and Mr. Williams a lump sum of $25 million, which was ultimately accepted by petitioner and Mr. Williams. Once Ashland suggested the $25 million settlement figure, however, petitioner and Mr. Williams had to work out an allocation of the lump sum between the two of them. Petitioner and Mr. Williams agreed to apportion the $25 million between them by allocating 65.1 percent ($16,275,000) to petitioner and 34.9 percent ($8,725,000) to Mr. Williams based on the relative amounts that the jury had awarded each of them exclusive of punitive damages and the damages the jury had awarded under RICO.[5] Although the calculation of 65.1 percent of $25 million equals $16,275,000, the evidence indicates that petitioner was in fact paid $16,744,300 by Ashland, and we will hereafter refer to such figure ($16,744,300) as the settlement proceeds (settlement proceeds).

---

[5] The judgment provided that petitioner was to receive $14,448,312 and Mr. Williams was to receive $7,743,477 exclusive of RICO and punitive damages. The percentages for the allocation of any settlement were derived in the following manner. First, all of the damages excluding RICO and punitive damages that petitioner and Mr. Williams were to receive under the judgment were added together and totaled $22,191,789. Petitioner's percentage was derived by dividing what he would have received by the total that would have been paid to both parties. Using the actual numbers, $14,448,312 divided by $22,191,789, petitioner's share equals 65.1 percent. Mr. Williams' share equals 34.9 percent or $7,743,477 divided by $22,191,789.

Pursuant to the settlement agreement, of the $16,744,300 of settlement proceeds paid to petitioner, $12,250,215 was paid in extinguishment of his wrongful discharge tort claim (wrongful discharge tort claim), and $2,044,085 was paid in extinguishment of his breach of contract claim (breach of contract claim). The allocation of the settlement proceeds between the wrongful discharge tort claim and the breach of contract claim was based on appellate counsels' estimates of probability of appellate success on the merits, recognition of the jury verdict, and mutual assessment of the total and relative values of the claims.

In the settlement agreement, the parties agreed that $12,250,215, the amount attributable to the wrongful discharge tort claim, represented compensatory damages which were properly excludable from petitioner's gross income under section 104(a)(2). The parties further agreed that $2,044,085, the amount attributable to the breach of contract claim, constituted gross income to petitioner under section 61. The settlement agreement provides in pertinent part:

F. In recognition of the trial jury's verdict and based upon their mutual assessment of the total and relative values of the Claims (but without any admission of liability by Ashland with respect to any Claim), Ashland shall pay for and on behalf of itself and all other defendants to McKay the consideration set forth in paragraph 1(d) of this memorandum as follows:

| Claim | Amount Allocable |
|---|---|
| Wrongful Discharge Tort Claim | $12,250,215 |
| Contract Breach Claim | $2,044,085 |
| TOTAL | $14,294,300 |

G. Based upon the nature and origin of each Claim, Ashland and McKay have agreed that:

(1) The sums allocable to the Wrongful Discharge Tort Claim, representing compensatory damages payable on account of an alleged tort-type invasion of the rights that McKay is granted by virtue of being a person in the sight of the law, are properly excludable from McKay's gross income under Section 104(a)(2) of the Internal Revenue Code of 1986, as amended (the "Code"); and

(2) The sums allocable to the Contract Breach Claim, representing compensatory damages payable on account of Ashland's alleged breach of McKay's employment contract, constitute gross income to McKay within the meaning of Section 61 of the Code.

Throughout the settlement discussions, Ashland adamantly refused to reach an agreement with petitioner if any amount

of the settlement proceeds was to be allocated to RICO or punitive damages. Accordingly, the settlement agreement includes the following statement, which expresses the understanding that none of the settlement proceeds were being paid on account of RICO or punitive damages:

> E. The parties' allocation of the settlement amount among the Claims as set forth in subparagraph F below is based directly upon Ashland's absolute insistence that Ashland will pay nothing with respect to the RICO Claim, punitive damages or alleged intentional misconduct claims and upon appellate legal counsel's consensus estimate of McKay's probability of appellate success with respect to the other two Claims as set forth above. In other words, in determining the amount that Ashland is willing to pay and that McKay is willing to accept in settlement of all the Claims, McKay has necessarily acceded to Ashland's demand that nothing be allocated to the RICO Claim, punitive damages claims, or alleged intentional misconduct claims and Ashland and McKay have both relied upon their appellate counsel's consensus estimate of McKay's probability of appellate success with respect to the two other claims. * * *

Although petitioner desired that a portion of the settlement proceeds be allocated to the RICO claim in order to publicize Ashland's unlawful activity, he reluctantly agreed to settle without allocating any of the settlement proceeds to either RICO or punitive damages because of the risks he would face on appeal and the fact that Ashland threatened petitioner with continued litigation for 15 to 20 years.

In addition, as part of the settlement agreement, petitioner received a partial reimbursement of his legal expenses from Ashland which included: (1) $450,000 to Brown, Todd for partial payment of petitioner's fees in defending petitioner in the shareholders' derivative action;[6] (2) $350,000 to Wilmer, Cutler on behalf of petitioner for fees from petitioner for the same derivative action as well as representation before the SEC; and (3) $1,650,000 to petitioner and Brown, Todd for partial payment of petitioner's litigation costs. In total, petitioner received $16,744,300[7] in settlement proceeds from Ashland.

---

[6] Some of Ashland's shareholders brought a derivative action against several of Ashland's officers and directors. Petitioner was a named defendant. We will refer to this matter *infra* in the section of our findings relating to Brown, Todd's defense of petitioner.

[7] The $16,744,300 is derived by adding together the following figures:

| | |
|---|---|
| Wrongful discharge tort claim | $12,250,215 |
| Breach of contract claim | 2,044,085 |
| Legal fees to Brown, Todd for derivative suit | 450,000 |

The U.S. District Court judge presiding over petitioner's wrongful discharge action entered an order of approval of the settlement agreement. In the order, the court concluded that the allocations in the settlement agreement were reasonable and that such allocations fairly reflected the relative value of petitioner's claims. The judge also determined that the amount petitioner received in reimbursement for legal expenses was proper.

On their 1988 Federal income tax return, petitioners included in gross income the entire amount of the settlement proceeds allocated to the breach of contract claim ($2,044,085), plus the settlement proceeds allocated as partial reimbursement of legal expenses from Ashland ($2,450,000), which amounted to a total of $4,494,085. Petitioners excluded from gross income the portion of the settlement proceeds that was allocated to the wrongful discharge tort claim; i.e. $12,250,215. Respondent determined that the entire $16,744,300 of settlement proceeds that petitioner received constituted compensation to petitioner during 1988, and therefore, should be included in petitioners' gross income for that year.

*Brown, Todd's Defense of Petitioner*

*The Derivative Suit*

When petitioner retained Brown, Todd to represent him in the wrongful discharge action, Brown, Todd had already been providing him with legal representation on other matters arising out of his employment at Ashland. During 1984, various shareholders of Ashland initiated a shareholders' derivative action[8] claiming that several officers and directors at Ashland had violated the FCPA, had made illegal payments to the detriment of Ashland, had committed corporate fraud and waste, and had breached their fiduciary duties to the corporation. Petitioner was a named defendant and was the only nondirector named as a defendant.

---

|  |  |
|---|---|
| Legal fees to Wilmer, Cutler for derivative action and SEC representation | 350,000 |
| Legal costs | 1,650,000 |
|  | 16,744,300 |

[8] The action was entitled *Howes v. Atkins,* No. 83–279 (E.D. Ky.), which will hereinafter be referred to as the derivative action.

Specifically, the shareholders sought damages as a result of the following four Ashland business transactions: (1) The previously mentioned $1.35 million disguised payment to Mr. Omar; (2) the acquisition of a 75-percent interest in a chromium mining operation in Rhodesia for more than $25 million by Ashland even though Ashland was aware that the mine was not valuable and that the payments were made to benefit foreign officials in Oman; (3) the investment by Ashland of more than $2.3 million in a reusable sausage casing process with a considerable portion of the money being a disguised payment to or for the benefit of Mr. Omar; and (4) disguised payments of more than $17 million to influence foreign officials of Abu Dhabi to provide oil for Ashland.

Petitioner initially hired Brown, Todd to defend him in the derivative action in January 1984. John McCall (Mr. McCall) was appointed lead counsel and as such was responsible for planning litigation strategy. Robert Dibert (Mr. Dibert), an associate, was responsible for the bulk of the legal research, factual analysis, and motion practice. At least two other attorneys and two other paralegals assisted Mr. McCall and Mr. Dibert in the defense of petitioner.

In the derivative action, the shareholders sought compensatory damages in the amount of $44 million. They also brought a RICO claim against all defendants which, if successful, would treble the amount of damages to $132 million. As a named defendant, petitioner was potentially liable for all damages as well as legal fees and costs. Most of the derivative action was settled in 1986. Although the derivative action against petitioner remained, it was ultimately dismissed in 1988 after the wrongful discharge action was tried. Petitioner was never found to be responsible or liable for any damages as a result of the derivative action.

### Other Investigations and Proceedings

The same suspicious transactions at Ashland which gave rise to the derivative action were also being investigated by many agencies such as the SEC,[9] the IRS,[10] and several inves-

---

[9] The SEC was investigating Ashland for possible violation of a 1975 consent decree and alleged disguised payments to foreign officials. Brown, Todd defended petitioner from possible civil and criminal sanctions in the SEC investigation.

[10] The IRS continued to question petitioner about his responses to the Five Questions. Brown, Todd reviewed and gathered information and documents in response to inquiries by the IRS.

tigation teams appointed by Ashland.[11] Brown, Todd represented petitioner in all of these matters because of the impact that such related matters might have on the wrongful discharge action.

Petitioner was also involved in the Williams case. Ashland brought counterclaims against petitioner in the Williams case alleging that petitioner was in cahoots with Mr. Williams to breach their fiduciary duties toward Ashland, that petitioner and Mr. Williams were disruptive, and they conspired to get themselves fired from Ashland. Brown, Todd defended petitioner in the Williams case as well.[12]

*Petitioner's Fee Arrangements With Brown, Todd*

When petitioner initially retained Brown, Todd to defend him in the derivative action, petitioner was to pay Brown, Todd on an hourly basis for legal fees in addition to paying the costs of litigation. Once Brown, Todd agreed to represent petitioner in the wrongful discharge action in addition to the derivative action, petitioner was to pay legal fees and costs for the wrongful discharge action on an hourly basis as well. The parties entered into a fee agreement which required petitioner to maintain a $10,000 balance in an account that Brown, Todd had provided. If petitioner failed to maintain the required balance, then Brown, Todd could terminate the arrangement. The agreement also stated that Brown, Todd would continue to represent petitioner in the derivative action and would "segregate as carefully as practicable" the legal fees and costs for the derivative action. Thus, Brown,

---

Brown, Todd kept the IRS informed with regard to the status of the various litigation proceedings that were pending against petitioner and Ashland. The thrust of Brown, Todd's work with respect to inquiries by the IRS was to protect petitioner from liability for criminal penalties arising out of his responses to the Five Questions and his former employment at Ashland.

[11] For example, Brown, Todd represented petitioner in the Queenan investigation, which was set up by Ashland to study the transactions giving rise to the derivative action. In addition, Ashland set up a committee known as the "Litigation Oversight Committee" (LOC) to supervise the derivative action. Brown, Todd was responsible for answering the requests of the LOC.

Brown, Todd also worked to disqualify one law firm from its representation of Ashland and to defend petitioner from "Ashland's Army", the multitude of law firms that were representing various participants in the derivative action.

Petitioner also enlisted Brown, Todd's services when he appeared as a witness before Inland Revenue, the United Kingdom's equivalent of the IRS.

[12] All such related matters in which Brown, Todd defended petitioner (i.e., dealings with the SEC, the IRS, the Queenan investigation, the LOC, Inland Revenue, and representation in the Williams case) will be referred to as the "defensive proceedings". The term "defensive proceedings" does not include the derivative action.

Todd was to continue to separately bill petitioner for the derivative action.

As the various proceedings progressed, the legal fees began to accumulate beyond petitioner's financial capacity. As an accommodation to petitioner, Brown, Todd entered into a new arrangement which restructured the fee agreement with respect to the wrongful discharge action. The new agreement was a contingency fee arrangement which provided that petitioner would pay Brown, Todd a fee equal to 35 percent of the gross amount recovered from Ashland unless the matter was appealed on the merits.[13] The agreement further provided that any amount designated as legal fees by court order or by settlement would offset the fee obligation. Petitioner was to pay all out-of-pocket expenses incurred by Brown, Todd or advanced by Brown, Todd on petitioner's behalf regardless of the gross amount of petitioner's recovery.

The new arrangement applied retroactively to the date Brown, Todd began representing petitioner in the wrongful discharge action. The fee arrangement in the derivative action was not affected by the new arrangement for the wrongful discharge action.[14]

During the fall of 1988, after the settlement order had been entered, petitioner requested that Brown, Todd allocate his legal fees and costs among the various legal matters in which Brown, Todd had represented him to help him in the preparation of his Federal and State income tax returns. In a letter dated December 29, 1988 (opinion letter), and signed

---

[13] If appealed, petitioner was to pay Brown, Todd 45 percent of the gross amount recovered.

[14] During the settlement negotiations, a dispute arose between Brown, Todd and petitioner concerning the proper interpretation of the contingency arrangement. The parties agreed to arbitrate the dispute, which was decided on Aug. 3, 1988, prior to the completion of the settlement negotiations. Michael Klein determined that the contingency fee was to be computed as follows:

From any settlement with a gross present value more than $23 million and less than $25 million plus one dollar, the shares of BEM [Bill E. McKay or petitioner] and BTH [Brown, Todd] shall be calculated as follows:

First, there shall be deducted $2.7 million.

Second, the resulting figure shall be multiplied by .651.

Third, to the resulting figure shall be added $250,000.

Fourth, the resulting figure shall be divided as between BEM and BTH on a ratio of 68% for BEM to 32% for BTH.

Fifth, the $2.45 million (steps First and Third) shall be distributed as follows: $450,000 to BTH; $350,000 to Wilmer, Cutler & Pickering; and $1,650,000 to BEM for out-of-pocket expenses paid or to be paid in connection with the wrongful discharge litigation.

If the gross amount of the settlement exceeds $25 million plus one dollar, BEM's 65.1% share of the excess shall be divided between BEM and BTH on a ratio of 32% (BEM) to 68% (BTH).

To the extent Ashland pays BEM an amount to facilitate his moving from Ashland, he shall retain all such amounts. [Fn. refs. omitted.]

by Mr. McCall, Brown, Todd stated that it had determined that not more than one-third of the total fees received from petitioner should be allocated to the wrongful discharge action. The remaining two-thirds of the total fees that Brown, Todd received from petitioner should be allocated to the derivative action and the other defensive proceedings. The letter did not specifically allocate the fees among the many components of petitioner's defense such as the derivative action, or any of the defensive proceedings such as representation before the SEC or the IRS, or the Queenan or LOC investigations. When writing the letter, Brown, Todd was aware that petitioner would use its allocation of fees for Federal and State income tax purposes.

*Legal and Litigation-Related Expenses*

*Petitioners' 1983–86 Tax Returns*

On petitioners' 1983 Federal income tax return, petitioners claimed a $22,268 deduction for employee business expenses. Petitioners attached a statement in support of the deduction to their return. In the statement, petitioners claimed that the expenses were directly related to the defense of petitioner's employment status and professional reputation. Respondent disallowed the deduction, asserting that petitioners did not establish that the expenses incurred constituted ordinary and necessary business expenses, were expended for a business purpose, or were not reimbursable to petitioner, or that the deduction was otherwise allowable for taxable year 1983.

On their 1984 tax return, petitioners claimed a $31,180.12 deduction for legal and professional fees, supplies, travel and entertainment, and meals and lodging. Petitioners attached a statement in support of the deduction to their Federal income tax return that claimed that the $31,180.12 was directly related to the defense of petitioner's employment status and business reputation. Respondent denied the deduction asserting that petitioners did not establish that the expenses incurred constituted ordinary and necessary business expenses, were expended for a business purpose, or were not reimbursable to petitioner, or that the deduction was otherwise allowable for taxable year 1984. Respondent further determined that, to the extent that the deduction was otherwise allowable, it was not allowed because it had not

been properly allocated between taxable and nontaxable income, and adequate records had not been maintained to determine such an allocation.

On their 1985 and 1986 returns, petitioners claimed deductions of $101,576.92 and $290,376.41, respectively, for various unreimbursed legal fees and miscellaneous expenses such as travel and lodging. Petitioners attached statements in support of the claimed deductions to their 1985 and 1986 returns. Such statements were identical to each other and similar to the statements submitted with their 1983 and 1984 returns. The statements asserted that all of the deductions were directly related to defending petitioner's employment status and professional business reputation. Respondent denied $101,137 of the deduction for 1985 and $289,752 of the deduction for 1986, citing the same reasons as asserted for the denial of the 1983 and 1984 deductions.

*Petitioners' 1988 Tax Return*

On their 1988 tax return, petitioners deducted $4,302,620 in litigation fees and costs, including interest paid to carry loans for litigation costs, for all of the matters in which Brown, Todd (and Wilmer, Cutler) defended petitioner. Petitioners computed such amount by using the opinion letter from Brown, Todd.[15] Petitioners then deducted $530,358.84 in legal fees attributable to the wrongful discharge action.[16] In addition, petitioners deducted $183,694.60

---

[15] Petitioners combined the amount of the fees allegedly paid to Brown, Todd in 1988, $5,104,176 (this number apparently includes the $450,000 paid to Brown, Todd as part of the settlement agreement in partial payment of legal fees for the derivative action) with the costs paid to Brown, Todd in 1988, $384,336.32, and the interest petitioner paid on loans to carry the legal costs, $440,121.67. These numbers totaled $5,928,633.99. Petitioners allocated two-thirds of $5,928,633.99 to Brown, Todd's defense of petitioner in the derivative action and the defensive proceedings such as the SEC hearings and IRS investigations, which amounted to $3,952,620.28. To this number, petitioners added the $350,000 in attorney's fees paid to Wilmer, Cutler for petitioner's defense. The resulting figure, $4,302,620.28, was the amount of the legal fees and costs that petitioners deducted on their 1988 return.

[16] While it appears that petitioners made some mathematical errors, petitioners' method for deriving their deduction for fees and costs attributable to the wrongful discharge action is as follows: Petitioners began by computing one-third of $5,928,633.99 (the total amount of fees and costs and interest to carry costs as outlined *supra* in note 15), which equals $1,976,211.30. Next, petitioners reduced that figure by a percentage equal to the taxable portion of the settlement proceeds pursuant to sec. 265. The resulting taxable percentage of the settlement proceeds was 26.84 percent, which petitioners obtained by dividing the portion that petitioner included in income ($4,494,085) by the total amount petitioner received in the settlement ($16,744,300). Finally, 26.84 percent of $1,976,211.30 is $530,415.11. Petitioners deducted $530,358.84 on their 1988 tax return.

for miscellaneous expenses such as travel and meals that they claim are related to the litigation.

On their 1988 tax return, as a result of such deductions, petitioners offset their gross income from the settlement proceeds and reported a $522,588.67 loss. Consequently, petitioners claimed an overpayment on their 1988 Federal income taxes in the amount of $408,908.15. Respondent disallowed the entire loss.

*Maintenance and Storage Expenses in 1989*

On Schedule C of their 1989 tax return, petitioners claimed an $88,338 deduction for the maintenance of legal records in 1989. Respondent denied the deduction.

*The Engelhard Expenses*

On their 1984, 1985, and 1986 tax returns, petitioners claimed deductions in the amounts of $16,324, $2,346, and $3,321, respectively, for expenses incurred as a consultant to Engelhard Corp. Respondent denied the deductions.

*Petitioners' Late Filing of the Tax Returns*

Petitioners' 1984 tax return was filed on February 1, 1989. Petitioners' tax returns for 1985 and 1986 were filed on April 19, 1989. Petitioners deliberately delayed the filing of their 1984, 1985, and 1986 Federal income tax returns to prevent Ashland from gaining access to the information contained in them.

Petitioners timely filed a Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return, for each of taxable years 1984, 1985, and 1986. The applications reported taxes owed which had previously been paid by petitioners. Petitioner informed the IRS and the Treasury Department that petitioners would be delaying the filing of their tax returns so that Ashland would not be able to obtain them through discovery. Ashland had previously requested copies of petitioners' tax returns and ultimately obtained an order requiring petitioner to produce all documents that he had filed with the IRS including tax returns.

OPINION

*Settlement Proceeds*

We must decide whether any of the settlement proceeds received by petitioner constitute gross income. Section 61 defines gross income to include "all income from whatever source derived." Section 104(a)(2) provides for the exclusion of "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries". The regulations broadly interpret this language as encompassing damages received "through prosecution of a legal suit or action based on tort or tort-type rights or through a settlement agreement in lieu of such prosecution." Sec. 1.104–1(c), Income Tax Regs. Accordingly, section 104(a)(2) excludes from gross income damages received for nonphysical (i.e., mental or emotional)[17] as well as physical injuries. *United States v. Burke,* 504 U.S. \_\_\_\_, \_\_\_\_, 112 S. Ct. 1867, 1871 n.6 (1992); *Church v. Commissioner,* 80 T.C. 1104, 1106 (1983).

Respondent contends that no part of the settlement proceeds qualifies for exclusion as "damages received * * * on account of personal injuries" under section 104(a)(2). In other words, respondent contends that the entire amount of the settlement proceeds, i.e., $16,744,300, is includable in petitioners' gross income. Respondent's contention is based primarily upon the contention that the settlement agreement should be disregarded. On the other hand, petitioners contend that the portion of the settlement proceeds allocated to the wrongful discharge tort claim, i.e., $12,250,215, is excludable under section 104(a)(2) because the settlement agreement expressly allocated the amount to petitioner's wrongful discharge tort claim. Petitioners contend that the settlement agreement should be respected because it was entered into between adverse parties at arm's length. Petitioners bear the burden of proof. Rule 142(a).

This Court has had many opportunities to address the issue of the proper allocation of the proceeds of a settlement agreement in the context of section 104(a)(2). See *Robinson*

---

[17] For settlements occurring after July 10, 1989, sec. 104(a) excepts punitive damage awards in cases not involving physical injury or physical sickness from the exclusion provisions of sec. 104(a)(2). Omnibus Budget Reconciliation Act of 1989, Pub. L. 101–239, sec. 7641(a), 103 Stat. 2106, 2379.

*v. Commissioner,* 102 T.C. 116, 125 (1994); *Horton v. Commissioner,* 100 T.C. 93 (1993); *Stocks v. Commissioner,* 98 T.C. 1 (1992); *Byrne v. Commissioner,* 90 T.C. 1000 (1988), revd. and remanded 883 F.2d 211 (3d Cir. 1989); *Metzger v. Commissioner,* 88 T.C. 834 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); *Threlkeld v. Commissioner,* 87 T.C. 1294 (1986), affd. 848 F.2d 81 (6th Cir. 1988); *Bent v. Commissioner,* 87 T.C. 236 (1986), affd. 835 F.2d 67 (3d Cir. 1987); *Fono v. Commissioner,* 79 T.C. 680 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984); *Glynn v. Commissioner,* 76 T.C. 116 (1981), affd. without published opinion 676 F.2d 682 (1st Cir. 1982); *Seay v. Commissioner,* 58 T.C. 32 (1972); *Fitts v. Commissioner,* T.C. Memo. 1994–52; *Miller v. Commissioner,* T.C. Memo. 1993–49, supplemented by T.C. Memo. 1993–588.

We have stated that express language in a settlement agreement is the most important factor in deciding whether a payment was made on account of a tortious personal injury for purposes of exclusion under section 104(a)(2). *Byrne v. Commissioner, supra* at 1007 (quoting *Metzger v. Commissioner, supra* at 837); see *Bent v. Commissioner, supra* at 244; *Glynn v. Commissioner, supra* at 120. We are not bound, however, by any factor or factors that are inconsistent with the true substance of the taxpayer's claim, nor are we bound by express allocations in a written settlement agreement if the parties did not engage in bona fide, arm's-length, adversarial negotiations. *Robinson v. Commissioner, supra.*

The common thread running throughout these cases is that the Court is called upon to characterize the payment received by an injured taxpayer from a tortfeasor as a consequence of the taxpayer's personal injury. It is this characterization process that governs the allocation between income which is taxable under section 61 and income which is excluded from taxation under section 104(a)(2). The goal is to ascertain "in lieu of *what* were damages awarded" or paid. *Bent v. Commissioner, supra* at 244 (emphasis added). In pursuit of that goal, we consider all of the facts and circumstances in ascertaining the true substance or nature of the claim that was settled. *Stocks v. Commissioner,* 98 T.C. 1, 11 (1992). Our inquiry is a factual one. *Id.*

If no lawsuit was instituted by the taxpayer, then we must consider any relevant documents, letters, and testimony as

we did in *Fitts v. Commissioner, supra.* If a lawsuit was filed but not settled, or if settled but no express allocations among the various claims are contained in the settlement agreement, we must consider the pleadings, jury awards, or any Court orders or judgments as we did in *Miller v. Commissioner, supra.* If the taxpayer's claims were settled and express allocations among the various claims are contained in the settlement agreement, we carefully consider such allocations. See *Byrne v. Commissioner, supra* at 1007 (quoting *Metzger v. Commissioner, supra* at 837); *Bent v. Commissioner, supra* at 244; *Glynn v. Commissioner, supra* at 120. As stated above, however, in order to be respected, the express allocations must be negotiated at arm's length between adverse parties. In *Robinson,* [18] we considered the circumstances under which we will disregard specific allocations made in a written settlement agreement. *Robinson* involved an action initiated by the taxpayers in State court against a Texas bank (the bank) for failure to release its lien on the taxpayers' property. After the jury returned a verdict in the taxpayers' favor for approximately $60 million, including $6 million for lost profits, $1.5 million for mental anguish, and $50 million in punitive damages, the parties settled. The conditions of the settlement agreement provided for the bank to pay the taxpayers $10 million in consideration for the taxpayers' release of the bank from any further liability on the taxpayers' claims against the bank. A final judgment was entered which allocated 95 percent of the $10 million settlement payment to mental anguish and 5 percent to lost profits. We held that the allocation in the final judgment was not to be respected because it was uncontested, nonadversarial, and entirely tax motivated and, therefore, did not accurately reflect the underlying claims.

We think that the facts of the instant case are distinguishable from those of *Robinson.* In *Robinson,* it was clear that the payor was not concerned with the allocation among the taxpayers' various claims. In fact, the record in *Robinson* included testimony that the bank did not care how the allocation was accomplished.

---

[18] *Robinson v. Commissioner,* 102 T.C. 116 (1994), was decided after the submission of the parties' briefs.

In contrast to *Robinson,* the record in the instant case establishes that petitioner and Ashland were hostile adversaries with respect to the allocations made in the settlement agreement. Petitioner wanted the settlement award to be as high an amount as possible to compensate him for his losses and wanted Ashland to be punished for its behavior. On the other hand, Ashland wanted to minimize the amount it needed to pay petitioner as well as avoid making any payment on account of petitioner's RICO claim.

Ashland made it clear that it would not settle if any of the damages were allocated to RICO claims, presumably because of the negative impact that payment of RICO damages would have on its reputation in the oil industry. The settlement agreement clearly states that Ashland was not paying petitioner to satisfy damages under RICO. Specifically, the settlement agreement provides:

E. * * * In other words, in determining the amount that Ashland is willing to pay and that McKay is willing to accept in settlement of all the Claims, McKay has necessarily acceded to Ashland's demand that nothing be allocated to the RICO Claim, punitive damages claims or alleged intentional misconduct claims, and Ashland and McKay have both relied upon their appellate counsel's consensus estimate of McKay's probability of appellate success with respect to the two other claims * * *.

Petitioner was never given the freedom to structure the settlement on his own. Instead, through intense negotiations, the parties reached an agreement that a portion of the proceeds was to be allocated to the wrongful discharge tort claim. Additionally, the District Court judge who had jurisdiction over the settlement of the case was closely involved with the settlement. According to the testimony of Mr. McCall, the judge strongly encouraged petitioner and Ashland to settle at the $25 million figure. Moreover, we note that the allocations in the settlement agreement are consistent with the entire record in that petitioner's pleadings and jury verdict reflect a lawsuit sounding primarily in tort, although it did have a contract component. As we see it, the settlement agreement provides the clearest embodiment of the payor's intent in the instant case.

Respondent argues that the payments by Ashland were deductible to Ashland regardless of the allocation between tort and contract in the settlement agreement, and that the

parties were, therefore, not adverse with respect to the tax consequences of their settlement. Respondent cites two cases in support of this argument: *Concord Control, Inc. v. Commissioner,* 78 T.C. 742, 745 (1982), and *Black Indus., Inc. v. Commissioner,* T.C. Memo. 1979–61. Both of these cases, however, involve allocations made in the purchase price of a business. We believe that such circumstances are factually distinguishable from a case involving a hostile litigation such as this one. Although the deductibility of the payor's payment might be a factor to consider in deciding whether the parties are adverse to their allocations, it is not controlling.[19]

We next address several other arguments posited by respondent. Respondent argues that the Court of Appeals for the Fifth Circuit[20] would hold that the entire settlement proceeds should be included in petitioners' gross income because the proceeds represent an accession to wealth. The only support respondent cites for that contention, however, is a footnote in a dissent in *United States v. Garber,* 607 F.2d 92, 103 n.4 (5th Cir. 1979) (Ainsworth, J., dissenting), a criminal tax evasion case, which states: "The touchstone of the exclusion [amended by section 104(a)(2)] is the notion that the funds received represent a restoration of funds rather than an accession to wealth." Respondent, however, apparently misses the import of the Supreme Court's opinion in *United States v. Burke,* 504 U.S. ____, 112 S. Ct. 1867 (1992). It is now quite clear that damages received on account of a tort-like personal injury are excludable under section 104(a)(2). *Id.* at ____, 112 S. Ct. at 1870.

Moreover, although the Court of Appeals for the Fifth Circuit has not had the occasion to directly address the tax consequences of a settlement agreement in the context of section 104(a)(2), the Court of Appeals for the Fifth Circuit has confronted the issue beyond the mere footnote in the *Garber* dissent. In *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565 (5th Cir. 1989), the Court of Appeals for the Fifth Circuit explained the scope of section 104(a)(2), relying on

---

[19] Although we do not decide the issue, if Ashland had made payment to petitioner on account of a RICO claim, as respondent argues, the deductibility of such a payment to Ashland could be uncertain. See Morse, Comment, "Treble Damages Under RICO: Characterization and Computation", 61 Notre Dame L. Rev. 526, 539–540 (1986).

[20] Absent stipulation to the contrary, venue for appeal of the instant case would be the Court of Appeals for the Fifth Circuit.

cases such as *Bent v. Commissioner, supra,* and *Metzger v. Commissioner, supra.* Interestingly, although *Johnston* was a civil rights case, the Court of Appeals for the Fifth Circuit discussed the excludability of the damage award under section 104(a)(2) because of the major role it had in the computation of the award. The Court of Appeals for the Fifth Circuit stated that when an award is made on account of tort or tort-like injuries, all damages, regardless of the method of computation, are excludable. *Id.* at 1580.

Respondent next contends that the tax character of the settlement proceeds must be based on the character of the claims that petitioner actually litigated against Ashland. Respondent contends that the claims that petitioner litigated were purely contractual under Kentucky law, pointing to the fact that the jury awarded petitioner damages for back and future pay. Respondent further contends that petitioner's public policy claim (i.e., that petitioner was fired in violation of public policy) sounded in contract because it was based on petitioner's performance of his job.

In making such arguments, respondent essentially asks us to disregard the settlement agreement, an argument which we rejected, see *supra* p. 484. Moreover, we note that the settlement agreement is consistent with Kentucky law, which recognizes both contract and tort claims in the context of the termination of one's employment. See *Firestone Textile Co. Div. v. Meadows,* 666 S.W.2d 730, 733 (Ky. 1983) (the cause of action for wrongful discharge "is but another facet of compensation for outrageous conduct as described in Restatement (Second) of Torts, Sec. 46 (1965), interference with prospective advantage as described in Prosser, Law of Torts, Sec. 130 (4th Ed. 1971), and invasion of privacy as described in Restatement (Second) of Torts, Sec. 652A & B (1965)."); *Ford Motor Co. v. Mayes,* 575 S.W.2d 480, 486 (Ky. Ct. App. 1978) ("Kentucky has long followed the general rule that punitive damages ordinarily are not recoverable for a breach of contract."). Consequently, under *United States v. Burke,* 504 U.S. at ___, 112 S. Ct. at 1873, the settlement proceeds received in extinguishment of the wrongful discharge claims are tortlike personal injury damages, which are excludable under section 104(a)(2).

Respondent's next argument is that no part of the settlement proceeds is excludable from income because the jury

awarded petitioner treble damages under his RICO claim, which was based on injury to petitioner's business or property. Respondent's argument once again raises the issue of disregarding the settlement agreement. As we stated *supra,* we will not ignore the express language of the settlement agreement in the instant case, which specifically stated that no part of the payment was to satisfy damages under RICO.

Respondent also argues that we should compare petitioner's claim with the claims made in the Williams case. Respondent contends that because Mr. Williams' claims were based on a contract theory and because petitioner's contract with Ashland was for a longer term than Mr. Williams' contract, petitioner should include at least $10,450,000 of the proceeds in his income. We, however, fail to see how the treatment of Mr. Williams in the settlement agreement should affect the instant case. Mr. Williams' claims against Ashland were based upon a different legal theory than petitioner's claims.

We have considered respondent's remaining arguments concerning the allocation issue and find them to be without merit.

Accordingly, we accept the express allocations in the settlement agreement and hold the $12,250,215 payment allocated to the wrongful discharge tort claim represents a payment for a tort type personal injury which is excludable from petitioners' income under section 104(a)(2).

## Legal and Litigation-Related Expenses

Petitioners claimed deductions under section 162 for legal fees, costs, and litigation-related expenses (hereinafter legal and litigation-related expenses) for taxable years 1983, 1984, 1985, 1986, and 1988.[21] In the notices of deficiency, respondent denied such deductions on the grounds that petitioners had not established that the expenses were: (1) Ordinary and necessary business expenses, (2) incurred for a business purpose, (3) not reimbursable, or (4) otherwise allowable. Additionally, to the extent the deductions would be otherwise allowable, respondent disallowed the deductions because they were not properly allocated between taxable and nontaxable

---

[21] On their 1983 tax return, petitioners claimed these deductions as employee business expenses on Form 2106. For all other years in issue, petitioner claimed the deductions on Schedule C.

income. Finally, respondent determined that, for taxable years 1985, 1986, and 1988, the deductions were improperly reported on Schedule C. Respondent, however, determined that the legal and litigation-related expenses should be allowed as miscellaneous itemized deductions[22] under section 212.

In deciding whether and to what extent the legal expenses and litigation-related expenses are deductible, we must consider the following issues: Initially, we must decide whether such expenses are deductible in general; next, if they are deductible, we must decide whether section 265 applies to any portion of such expenses; and finally, we must decide whether any allowable deductions should be taken as itemized expenses.

We first consider the issue of the general deductibility of the legal and litigation-related expenses. We must consider the context in which the expenses are incurred. See secs. 162, 212, 262, 263. If the expenses relate to the taxpayer's employment, then the deductibility of the expenses will turn on whether the expenses were paid or incurred in the course of the taxpayer's business. Sec. 162. It is well settled that an individual may engage in the trade or business of rendering services as an employee. *O'Malley v. Commissioner,* 91 T.C. 352, 363–364 (1988); *Primuth v. Commissioner,* 54 T.C. 374, 377 (1970). Consequently, an employee's business expenses may be deductible under section 162. *O'Malley v. Commissioner, supra* at 363–364; *Primuth v. Commissioner, supra* at 377–378; see *Mitchell v. United States,* 187 Ct. Cl. 342, 408 F.2d 435 (1969). It makes no difference whether the employee is defending himself in actions that challenge his activities as a corporate officer or the employee is bringing a suit against his former employer.[23]

---

[22] Respondent determined, however, that the expenses prior to 1988 should be capitalized and then deducted in 1988.

[23] The cases do not distinguish between the situation in which a taxpayer is defending himself and the situation in which a taxpayer initiates the suit. The expenses are deductible under sec. 162 so long as the transaction or transactions subject to litigation arose in the context of the taxpayer's trade or business. See *Butler v. Commissioner,* 17 T.C. 675, 681 (1951) (litigation expenses for defending a corporate officer for actions directly connected with his employment are ordinary and necessary and therefore, deductible); *McKeague v. United States,* 12 Cl. Ct. 671 (1987) (litigation expenses for bringing suit against former employer for lost wages originated in trade or business and are deductible), affd. without published opinion 852 F.2d 1294 (Fed. Cir. 1988).

Petitioner's legal and litigation-related expenses were incurred in the course of carrying on his trade or business as a corporate executive at Ashland. Accordingly, petitioner's expenses are deductible, if at all, under section 162. Respondent argues that section 212(1) controls the deductibility of the expenses. We disagree. Section 212(1) permits a deduction for ordinary and necessary expenses paid or incurred during the taxable year "for the production or collection of income". Section 212(1), however, only permits deductions "with respect to income-producing or profit-seeking activities which do not constitute a trade or business." *Johnson v. Commissioner*, 72 T.C. 340, 347 (1979) (citing *United States v. Gilmore*, 372 U.S. 39, 44–45 (1963)); *Rafter v. Commissioner*, 60 T.C. 1, 8 (1973), affd. 489 F.2d 752 (2d Cir. 1974). In the instant case, petitioner's expenses were incurred in the trade or business of being an employee. Consequently, section 212(1), by its own terms, does not provide the basis for deductibility of such expenses. Our inquiry, however, does not end here. The deductibility of petitioner's legal and litigation-related expenses must also be tested against section 265.

Section 265 disallows deductions for amounts which are allocable to tax-exempt income. Accordingly, we must consider the extent to which petitioner's legal expenses are allocable to the wrongful discharge action, because any expenses which are attributable to the proceeds excluded from income under section 104(a)(2) are nondeductible under section 265.

During 1988, petitioner paid $5,104,176 for legal and litigation-related expenses. The amount petitioner ultimately paid Brown, Todd for the wrongful discharge action was not based on the itemized bills as prepared by Brown, Todd's attorneys. The legal fees for the wrongful discharge action were billed on a contingency basis. Consequently, petitioner requested that Brown, Todd allocate the fees between Brown, Todd's representation of petitioner in defense of actions brought against him (the derivative action/defensive proceedings) and the wrongful discharge action brought against Ashland (the wrongful discharge action) according to the amount of time spent on each respective action. Brown, Todd sent petitioner its opinion letter in response to that request. Brown, Todd's letter states that two-thirds of the legal expenses are attributable to Brown, Todd's representation of

petitioner in the derivative action/defensive proceedings and that the remaining one-third are attributable to the wrongful discharge action. Accordingly, on their 1988 return, petitioners treated two-thirds of the legal expenses as fully deductible and apportioned the remaining expenses between taxable and nontaxable income. Of the one-third allocated to the wrongful discharge action, petitioners only deducted the portion attributable to taxable income.

Respondent contends that the entire $5,104,176 that petitioners paid in legal and litigation-related expenses should be allocated to the wrongful discharge action because the amount of the legal fees was contingent and computed only on the gross amount of the settlement proceeds. Accordingly, respondent contends that all of the expenses should be apportioned via the formula used by the Court in *Church v. Commissioner,* 80 T.C. 1104, 1111 n.8 (1983). The *Church* formula is stated as follows:

$$\text{Legal expenses} \times \frac{\text{Nonexempt income}}{\text{Total award}} = \text{Deductible expenses}$$

Although we agree that the *Church* formula must be used in the instant case to apportion the legal and litigation-related expenses directly attributable to the wrongful discharge action, we must first consider whether any of the fees paid by petitioner are directly attributable to the derivative action/defensive proceedings.

In *Gilmore v. United States,* 372 U.S. 39, 49 (1963), the Supreme Court held that the origin of a claim governs the deductibility of a related expense. Consequently, to the extent that the legal and litigation-related expenses are attributable to the derivative action/defensive proceedings, the limitation in section 265 does not apply. Because petitioner was involved in different legal proceedings that have differing tax treatments, the various claims or actions must be analyzed separately. See *Gilmore v. United States, supra; McKeague v. United States,* 12 Cl. Ct. 671 (1987), affd. without published opinion 852 F.2d 1294 (Fed. Cir. 1988); *Buder v. United States,* 221 F. Supp. 425, 431–432 (E.D. Mo. 1963).

Although the fee arrangement for the wrongful discharge action ultimately turned out to be based on a contingency fee arrangement, separate hourly time records were maintained

by Brown, Todd for both the wrongful discharge action and the derivative action. Consequently, the record contains the precise amount of legal fees attributable to the derivative action.

The Brown, Todd time records show that $986,701.20 of time was expended in the derivative action.[24] At trial, however, Mr. McCall testified that Brown, Todd received $450,000 toward the $986,701.20 in fees pursuant to the settlement agreement and that the remainder was written off. The settlement agreement provided that petitioner was to receive partial reimbursement of his legal expenses and specifically designated that $450,000 was to be paid directly to Brown, Todd in partial payment of petitioner's fees in the derivative action. Mr. McCall further testified that the remaining $536,702.20 ($986,702.20 less $450,000) was added to the firm's separate account maintained for the wrongful discharge action, but only for Brown, Todd's internal accounting purposes.[25]

Petitioners argue that we should adopt the allocation set forth in Brown, Todd's letter because it best reflects the amount of time spent on the various matters. Respondent contends that because the fee arrangements required Brown, Todd to "segregate as carefully as practicable" all charges relating to the wrongful discharge action and the charges relating to the derivative action, the opinion letter is unnecessary. Respondent further argues that because the fee for the wrongful discharge action was to be on a contingency basis, all expenses should be allocated between taxable and nontaxable income.

Because the record indicates the exact amounts which should be allocated between fully deductible expenses attributable to the derivative action and partially deductible expenses attributable to the wrongful discharge action, we decline to follow either party's approach. As stated above, the settlement agreement provided that $450,000 was to be paid

---

[24] The first billing entry for the derivative action is Jan. 6, 1984. Although petitioner retained Brown, Todd to represent him in the derivative actions in August of 1983, Mr. McCall was unable to explain why the records do not reflect entries prior to Jan. 6, 1984.

[25] In other words, petitioner was not required to pay the contingency fee amount plus the amount that Brown, Todd had written off. Instead, the dollar amount was added to the separate account maintained by Brown, Todd for the wrongful discharge action, not for the purpose of billing petitioner (who was paying for that representation on a contingency basis) but for internal purposes only; i.e., to allow the attorneys who worked on the derivative action to receive individual credit for their work even though the time was not being billed on an hourly basis.

to Brown, Todd for the derivative action, and Mr. McCall testified that the balance was written off by the law firm. The settlement agreement also provided that $350,000 was to be paid to Wilmer, Cutler for their representation of petitioner in the derivative action and before the SEC. Accordingly, we hold that petitioners are only entitled to allocate $800,000 to petitioner's legal expenses for the derivative action/defensive proceedings, which petitioners are entitled to deduct in full. We hold that the remaining $4,304,176 must be allocated to the wrongful discharge action.

Petitioners argue that the allocations in the Brown, Todd opinion letter are necessary because some of the time spent on defensive proceedings was billed to the wrongful discharge action account. Petitioners contend that it is inappropriate to subject fees for representation in defensive proceedings to the limit imposed by section 265. We think the evidence submitted in the instant case is insufficient to ascertain the extent to which the fees attributable to the defensive proceedings were commingled with those attributable to the wrongful discharge action. In any event, Mr. Dibert and Mr. McCall both testified that Brown, Todd's involvement in such proceedings was to ensure that none of such proceedings would have an adverse impact on the wrongful discharge action. In light of such statements, we conclude that Brown, Todd's representation of petitioner in such defensive proceedings is connected to the wrongful discharge action.

Of the $4,304,176 allocated to the wrongful discharge action, section 265 allows deduction of the expenses attributable to the taxable portion of the settlement proceeds. Under the *Church* formula, we hold that 26.8 percent of the portion of the legal expenses allocated to the contingency agreement is attributable to taxable income and may be taken as a deduction by petitioners in 1988.[26] We hold that the remainder is not deductible.

Respondent does not contest that petitioners may deduct, in the year paid, the legal and litigation-related expenses which were incurred prior to 1988. We note, however, that all of petitioner's legal and litigation-related expenses for tax-

---

[26] The percentage is derived by taking the amount petitioner included in income and dividing it by the total received in settlement of his lawsuit against Ashland:

$$\frac{\$4,494,085}{16,744,300} = 26.8 \text{ percent}$$

able years prior to 1988 must be allocated between taxable and nontaxable income to ascertain the allowable deductions for those years as well.

We next consider the issue of whether petitioners' deductions must be itemized. Petitioners contend that, because the deductions were incurred in a trade or business, the deductions are not itemized deductions but instead are deductions which should be taken under section 162 to arrive at adjusted gross income. We disagree. Section 62, which defines adjusted gross income, lists the deductions from gross income which are allowed for the purpose of computing adjusted gross income. Section 62(1) states the general rule that trade or business deductions are allowed for the purpose of computing adjusted gross income only "if such trade or business does not consist of the performance of services by the taxpayer as an employee".[27] Consequently, for employed individuals, section 162 trade and business deductions ordinarily are itemized deductions. Secs. 161 and 162.

Section 62(2), however, lists trade and business deductions of employees that are allowed for the purpose of computing adjusted gross income.[28] For taxable years 1983 through 1986, section 62(2) allows deductions to employees for reimbursed expenses, expenses for travel away from home, and transportation expenses. Sec. 62(2)(A), (B), and (C). For taxable years beginning after 1986, for the purpose of computing adjusted gross income, section 62(a)(2) only allows employees (other than performing artists) deductions for reimbursed expenses.

To reiterate, petitioner was in the trade or business of being an employee. To the extent substantial, petitioners would be entitled to travel and transportation deductions for the purpose of computing adjusted gross income for taxable years 1984, 1985, and 1986. Petitioners, however, have failed to prove the amounts which satisfy section 62(2). Consequently, we hold that petitioners must itemize their deductions for legal and litigation-related expenses for 1984, 1985, 1986, and 1988 on Schedule A rather than on Schedule C.[29]

---

[27] For taxable years beginning after Dec. 31, 1986, sec. 62(1) was renumbered as sec. 62(a)(1).

[28] For taxable years beginning after Dec. 31, 1986, sec. 62(2) was renumbered as sec. 62(a)(2).

[29] Nonetheless, as petitioner's 1983 business expenses are reimbursed employee expenses allowed under sec. 62(2)(A), they were properly deducted for the purpose of computing adjusted gross income, and were properly reported on Form 2106.

Section 67(a) imposes a 2-percent floor on the miscellaneous itemized deductions of individuals for all taxable years beginning after December 31, 1986. Miscellaneous itemized deductions are defined in section 67(b) as those itemized deductions that are not specifically enumerated in section 67(b). As section 162 itemized deductions are not included in section 67(b), they are limited by the 2-percent floor. Sec. 1.67–1T(a)(1)(i), Temporary Income Tax Regs., 53 Fed. Reg. 9875 (Mar. 28, 1988). Accordingly, we further hold that petitioners' deductions for 1988 are limited by the 2-percent floor under section 67(a).

### $80,000 Payment to Brown, Todd in December 1988

Petitioners seek to deduct a payment of $80,000 allegedly made by petitioner to Brown, Todd during December 1988. Respondent contends that there is no record of such a payment being made. Under the cash method of accounting, a taxpayer is only entitled to deductions for the taxable year during which the expenses were paid. Sec. 1.461–1(a)(1), Income Tax Regs. Petitioners have the burden of proving that payment was made. Rule 142(a). Petitioners have failed to show any payment of $80,000 to Brown, Todd during December 1988. Consequently, we sustain respondent's determination with respect to the $80,000 deduction.[30]

### $51,678 Deduction for Other Legal Fees

On their 1988 tax return, petitioners claimed an additional deduction in the amount of $51,678 as "other legal expenses". Petitioners have the burden of proving that they are entitled to the deduction. Rule 142(a). Petitioners have failed to offer any evidence or make any arguments that they are entitled to the deduction. Consequently, we sustain respondent's disallowance of the $51,678 of other legal expenses.

### Interest Expense

During the years 1984 through 1988, petitioner borrowed money to pay some of his legal expenses. After the settlement of the wrongful discharge action, petitioner repaid the

---

[30] We note that even if petitioners had shown that they were entitled to the deduction, it would be limited by sec. 265 and would be subject to the formula in *Church v. Commissioner,* 80 T.C. 1104, 1106 (1983). It also would be an itemized deduction.

loans, and, additionally, he paid accrued interest in the amount of $44,121.67. Petitioners contend that the interest was directly related to litigation arising out of petitioner's trade or business, and that the expense is therefore deductible under section 163. Respondent contends that the interest is nondeductible personal interest under section 163(h)(2)(A).

Section 163(h)(1) disallows deductions for "personal interest" paid or accrued during the taxable year. Under section 163(h)(2), personal interest is defined as:

any interest allowable as a deduction under this chapter other than—
  (A) interest paid or accrued on indebtedness properly allocable to a trade or business (*other than the trade or business of performing services as an employee* * * *) [Emphasis added.]

Petitioner's interest expense arose out of litigation which was directly related to being an employee, albeit an officer, of Ashland. The fact that petitioner was self-employed as a chemical engineer during 1988 does not alter the fact that his interest expenses were related to his status as an employee of Ashland and are therefore allocable to that trade or business of providing services. Consequently, the interest in question is personal interest.

The disallowance of deductions for personal interest is phased in over 4 years beginning with taxable years after 1986. Sec. 163(d)(6), (h)(5). Accordingly, the deduction for 1988, the year in which petitioners paid the interest in question, is limited to 40 percent of the interest.

*Maintenance and Storage Expenses*

On their 1989 tax return, petitioners claimed a deduction in the amount of $88,338 for maintenance and storage expenses of business records. Respondent disallowed the deduction because petitioners had not shown that the expenses were (1) ordinary and necessary business expenses, (2) not reimbursable, and (3) otherwise allowable.

Petitioners have the burden of proving that they are entitled to the deductions. Rule 142(a). Petitioners have failed to present any evidence or make any arguments regarding such deduction. Consequently, we sustain respondent's determination as to the $88,338 of maintenance and storage expenses.

*Engelhard Expenses*

On their 1984, 1985, and 1986 returns, petitioners claimed deductions of $16,324, $2,346, and $3,321, respectively, for expenses incurred by petitioner as a consultant for Engelhard Corp. Respondent denied such deductions as being unsubstantiated. Petitioners have the burden of proving that they are entitled to such deductions. Petitioners have failed to present any evidence or make any arguments regarding such deduction. Rule 142(a). Consequently, we sustain respondent's determination as to the "Engelhard expenses".

*Section 6651(a)(1) Additions to Tax*

In the case of a taxpayer who fails to timely file his tax return, section 6651(a)(1) provides for an addition to tax, unless the taxpayer can demonstrate that the failure to file was due to reasonable cause and not due to willful neglect. Sec. 6651(a)(1). Although reasonable cause is not defined in the Internal Revenue Code, the regulations state: "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." Sec. 301.6651–1(c)(1), Proced. & Admin. Regs. Willful neglect has been defined as a "conscious, intentional failure or reckless indifference". *United States v. Boyle,* 469 U.S. 241, 245 (1985).

It is undisputed that petitioners' 1984, 1985, and 1986 tax returns were not timely filed. Consequently, we must decide whether petitioners' untimely filing was due to reasonable cause and not due to willful neglect. The questions of "reasonable cause" and "willful neglect" are questions of fact and petitioners have the burden of proof. Rule 142(a); *Lee v. Commissioner,* 227 F.2d 181, 184 (5th Cir. 1955), affg. a Memorandum Opinion of this Court.

Petitioner testified that Ashland repeatedly requested production of petitioners' tax returns in order to evaluate whether petitioner could financially withstand prolonged litigation. Ultimately, Ashland obtained an order requiring petitioner to produce all documents which he had filed with the IRS for the years in issue. Petitioners assert that they deliberately delayed the filing of their tax returns for taxable years 1984, 1985, and 1986 to avoid having to submit the

returns to Ashland for discovery purposes. Petitioners contend that such action was "reasonable cause" for their failure to timely file. We disagree.

In *Kirschbaum v. Commissioner,* T.C. Memo. 1989–526, we stated:

Even in the context of a criminal case, a taxpayer does not have a privilege to refuse to file tax returns merely because a criminal investigation may be pending against him. *United States v. Sullivan,* 274 U.S. 259 (1927); *United States v. Malquist,* 791 F.2d 1399 (9th Cir. 1986); *United States v. Carlson,* 617 F.2d 518 (9th Cir. 1980). A fortiori, a Fifth Amendment claim is not reasonable cause for failure to file a tax return, which is required to avoid the addition to tax under section 6651(a)(1). * * *

If the Fifth Amendment is not considered to be reasonable cause that will excuse untimely filing, then it certainly follows that preventing a party-opponent from having access to tax return information cannot be reasonable cause. Additionally, we note that the information that petitioner sought to protect would have likely been discoverable directly from petitioner by Ashland. Consequently, we fail to understand petitioners' contention that such information would have been protected by failing to file such returns.

Moreover, petitioners have not established that they relied on the advice of a professional in delaying the filing of their returns. See *United States v. Boyle,* 469 U.S. 241, 245–253 (1985). Petitioners' mere belief that they had a reasonable excuse to defer the filing of their tax returns is insufficient to establish reasonable cause. *Id.*

Petitioners also assert that respondent should be estopped from imposing the addition to tax because petitioner openly discussed the decision to delay the filing of petitioners' returns with the IRS and no one at the IRS had ever advised him that the delay was unreasonable. It is "fundamental that to constitute estoppel there must be a false representation or wrongful, misleading silence relied on by the party claiming estoppel and the error must originate in a statement of fact and not in an opinion or a statement of law." *Ginsberg v. Commissioner,* 24 T.C. 273, 278 (1955). Petitioners have not established that the actions of the IRS amounted to a "wrongful misleading silence".[31]

---

[31] The other elements of estoppel are: (1) The person claiming the benefits of estoppel must be ignorant of the facts; (2) the person claiming the benefits of estoppel must reasonably rely

Petitioners further maintain that they timely filed a Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return, for each year in issue. Included on each form was the amount of tax liability that petitioners believed was due. Petitioners paid the amounts that they believed to be due when they submitted the extension forms. Petitioners contend that, because they paid the tax that they believed was due and owing for each year in issue, the additions to tax do not apply.

Section 6651(a)(1) mandates that where a taxpayer has failed to file a tax return *on the prescribed due date,* [32] there shall be added to the amount required to be shown as tax on the return 5 percent of the amount of such tax per month not to exceed a maximum of 5 months or 25 percent. Petitioners filed their 1984, 1985, and 1986 returns during 1989. The mere fact that petitioners submitted timely extension forms is not a substitute for filing a timely tax return. The returns must still be filed by the extended due date in order to avoid the addition to tax.

We hold that petitioners' failure to timely file their tax returns for taxable years 1984, 1985, and 1986 was not due to reasonable cause and was due to willful neglect. Accordingly, petitioners are liable for the additions to tax under section 6651(a)(1) for taxable years 1984, 1985, and 1986.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

on the facts or statements of the one against whom estoppel is claimed; and (3) the person claiming the benefits of estoppel must be adversely affected by the acts or statements of the [one] against whom estoppel is claimed. See *Kronish v. Commissioner,* 90 T.C. 684, 695 n.10 (1988). Petitioners have failed to establish these elements as well.

[32] The prescribed due date is determined by considering extensions of time for filing.